UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL R. FANNING, as CHIEF EXECUTIVE OFFICER OF THE CENTRAL PENSION FUND ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CA No.: 06cv02177-RJL |
| ) | |
| HIGH MOUNTAIN INSPECTION SERVICES, INC. ) ) | |
| Defendant. ) | |

### UNREPORTED CASE APPENDIX

Central States v. Charles Hester,
    1984 U.S. Dist. LEXIS 15154 (N.D. Ill. 1984) ............................................ 00001 - 00003

Chartier v. J&F Mang't Corp.,
    15 E.B.C. 2942 (S.D.N.Y. 1992) ......................................................... 00004 - 00008

Demolition Workers Union v. Mackroyce Contracting Corp.,
    25 E.B.C. 1344 (S.D.N.Y 2000) ......................................................... 00009 - 00017

Laborers' International Union of Am. National (Industrial) Pension Fund
    v. Pacific Ascorp,
    12 E.B.C. 1864 (D.D.C. 1990)............................................................ 00018 - 00022

McCrory v. G.C. Monaco Electric, Inc.,
    1989 U.S. Dist. LEXIS 7573 (S.D.N.Y. 1989)........................................... 00023 - 00027

Revenue Ruling 85-130 (August 26, 1986) .............................................. 00028 - 00029

Dated: January 17, 2007                  Respectfully submitted,

**O'DONOGHUE & O'DONOGHUE LLP**
4748 Wisconsin Avenue, N.W.
Washington, D.C. 20016
Telephone: (202) 362-0041
Facsimile: (202) 237-1200

Charles W. Gilligan (Bar No. 394710)
R. Richard Hopp (Bar No. 432221)

*Attorneys for the Central Pension Fund*

150738_1.DOC

1

LEXSEE 1984 U.S. DIST. LEXIS 15154



Cited
As of: Jan 17, 2007

**CENTRAL STATES, etc., Plaintiffs, vs CHARLES HESTER, Defendant.**

**No. 84 C 3516**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

**1984 U.S. Dist. LEXIS 15154**

**July 6, 1984**

**OPINION BY:** [*1]

LEIGHTON

**OPINION:**

Judge Leighton

ORDER GRANTING A PRELIMINARY INJUNCTION

On June 15, 1984, the Court held an evidentiary hearing on the Plaintiffs' Motion for a Preliminary Injunction directing the Defendant, Charles Hester ("Hester"), to pay monthly, ongoing pension contributions. Appearing on behalf of the Plaintiffs at the hearing were attorneys Daniel Locallo and John Lynch. Apearing on behalf of Defendant Hester was attorney Michael A. Lowe. Two witnesses testified on behalf of the Plaintiffs: the Defendant called no witnesses.

In accordance with Federal Rule of Civil Procedure (FRCP) 52(a), the following findings of fact and conclusions of law shall be entered by the Court as grounds for this Court's granting the Plaintiffs' Motion for a Preliminary Injunction.

FINDINGS OF FACT

1. The Plaintiff, the Central States, Southeast and Southwest Areas Pension Fund ("the Pension Fund"), is a common law pension trust established by a trust agreement, and operating as an employee benefit plan (as defined in ERISA Sec. 1002(3)). The principal place of business of the Plaintiff Pension Fund is 8550 West Bryn Mawr Avenue, Chicago, Illilnois. The Pension Fund is a multi-employer [*2] plan (as that term is defined in ERISA Sec. 1002(37)(A)).

The Plaintiff, Howard McDougall ("McDougall"), is a trustee and fiduciary of the Pension Fund, and is authorized to bring actions to collect delinquent contributions under ERISA. See ERISA Sec. 502(a)(3).

2. Defendant Hester is the owner of an unincorporated business, located at 5929 South State Street, Chicago, Illinois. Defendant Hester does business under the name of Coronet Appliance Company at this address. Defendant Hester is an employer and a party-in-interest in an industry affecting commerce, as those terms are defined in ERISA Sec. 1002(5), (11), (12), and (14).

3. Defendant Hester and Teamsters Local Union No. 705 ("Local 705") entered into a collective bargaining agreement on November 22, 1982, covering the period of July 1, 1982 through and including July 1, 1985. The effective date of the collective bargaining agreement was July 1, 1982.

4. By virtue of the collective bargaining agreement, Defendant Hester became obligated for the three-year period therein to pay monthly contributions to the Pension Fund on behalf of all employees working in bargaining unit job classifications specified by the [*3] collective bargaining agreement. The parties in this litigation have stipulated to the terms of the collective bargaining agreement. The Court notes that the collective bargaining agreement, besides containing the Defendant's obligation

1984 U.S. Dist. LEXIS 15154, *

to contribute, also requires the Defendant to follow rules and regulations enacted by the Pension Fund.

5. Pursuant to ERISA Sec. 402(a)(1) and LMRA Sec. 302(c)(5)(B), the Pension Fundd is governed and maintained pursuant to a written instrument known as the Pension Fund Trust Agreement ("the Trust Agreement"). The Trust Agreement relegates to the Pension Fund's Trustees certain rights and duties, and also imposes obligations on contributing employers.

6. Specifically, Article III, Section 1 of the Trust Agreement requires Defendant Hester to make continuing and prompt payments to the Pension Fund in accordance with the terms of the collective bargaining agreement.

7. The Pension Fund has also enacted certain rules and regulations relative to payment of employer contributions. Pension Fund Special Bulletin #31 requires employers to pay contributions by the 15th day of the month following each billed month. Also, employers are reminded [*4] on each billing statement to submit contributions by the 15th day of the month after each billed month.

8. In spite of his contractual and plan obligation to make contributions, the Defendant has failed to make required contributions to the Pension Fund. As of June 15, 1984, the Defendant owes $5,407.14 in pension contributions. During the period of April 1983 through May of 1984, the Pension Fund sent 14 monthly billing statements to the Defendant. However, the Defendant only submitted three contributions during this period.

The Court notes that the Plaintiffs in their Motion do not seek to recover past due contributions but only seek to obtain an order mandating payment of future contributions. All the same, the Defendant's past conduct is relevant to the Plaintiffs' claim that there is a likelihood of the Defendant's future violations of the pension contribution requirement. See Janowski v. Interenational Brotherhood of Teamsters, Local No. 710 Pension Fund, 673 F.2d 931, 940 (7 Cir.) (1982).

9. ERISA, as well as regulations promulgated by the United States Department of Labor, require the Pension Fund to grant service credits to employees of contributing employers [*5] when employees are working pursuant to collective bargaining agreements. An employee receives pension service credits by virtue of the fact of his working, and irrespective of whether his employer makes contributions.

10. The Defendant's failure to make required contributions to the Pension Fund compromises the financial soundness of the Pension Fund. This is so because, if an employer fails to make required contributions, the Pension Fund is still required to grant pension service credits to the employees working for an employer.

CONCLUSIONS OF LAW

1. To obtain preliminary injunctive relief, a plaintiff must show that:

"(1) It has at least a reasonable likelihood of success on the merits, (2) it has no adequate remedy at law and will otherwise be irreparably harmed, (3) the threatened injury to it outweighs the threatened harm the preliminary injunction may cause the defendants, and (4) the granting of the preliminary injunction will not disserve the public interest."

Syntex Ophthalmics, Inc. v. Tsuetaki, 701 F.2d 677, 681 (7 Cir.) (1983), quoting Machlett Laboratories, Inc. v. Techny Industries, Inc., 665 F.2d 795, 796-97 (7 Cir.) (1981).

2. ERISA collection cases [*6] are exceptions from the general rule of equity that equity will not enjoin either prohibitively or mandatorily the payment of money. However, in the context of ERISA, when contributing employers fail to make monthly contributions, a pension fund suffers irreparable injury.

3. The Plaintiffs have shown far more than reasonable likelihood of success on the merits. The collective bargaining agreement has been stipulated to and the Plaintiff's bookkeeper, Mr. Shaefer, testified to the extent of the Defendant's past failure to make contributions. (The Defendant waived his right of cross-examining Mr. Shaefer.)

4. The Defendant's failure to make required contributions compromises the financial soundness of the Pension Fund. See Central States v. Maurice Hall, F. Supp. , No. 84 C 1128, slip opinion (N.D. Ill.) (March 22, 1984); Central States, Southeast v. Hitchings Trucking, 472 F. Supp. 1243, 1247 (E.D. Mich.) (1979).

5. Further, the failure to make employer contributions will cause the Pension Fund irreparable injury for which a judgment for money damages at a future date is not an adequate remedy. See Painters Pension Fund v. Hartline-Thomas, Inc., F. [*7] Supp. , 4 EBC 1199, 1200 (D.D.C.) (1983).

6. The Defendant has not shown that he or his unicorporated business will suffer any harm if an injunction is granted. The injury to the Pension Fund that would result from not issuing a preliminary injunction outweighs any harm to the Defendant arising from issuing a preliminary injunction. Such harm to the Defendant is speculative at best.

7. It does not disserve the public interest to enforce the principles endorsed by Congress of promoting fiscal

1984 U.S. Dist. LEXIS 15154, *

integrity of employee benefit plans such as the Pension Fund involved in this litigation.

8. Inasmuch as Defendant Hester has not shown that this injunction will wrongfully enjoin or restrain him and has shown no possible damages which he would suffer or incur if the injunction is entered, the Plaintiffs are not required to give security prior to the issuance of the preliminary injunction. (Cf. FRCP. 65(c).)

ORDER

Until a final hearing and determination of this action by the Court, Defendant Charles Hester is enjoined from failing to comply with the Defendant's pension contribution obligation as stated in ERISA Sec. 515, the collective bargaining agreement, the Trust Agreement, [*8] and Special Bulletin #31. The Defendant is hereby mandatorily compelled to make pension contributions to the Pension Fund by the 15th day of the month following each billed month on behalf of all employees working in bargaining unit job classifications during the billed month.

LEXSEE 15 EBC 2942



Caution
As of: Jan 17, 2007

**CHARTIER, et al., Plaintiffs, v. J&F MANAGEMENT CORP, et al., Defendants.**

**92 Civ. 7272 (PNL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1992 U.S. Dist. LEXIS 17853; 15 Employee Benefits Cas. (BNA) 2942**

**November 24, 1992, Decided
November 25, 1992, Filed**

**JUDGES:** [*1] Leval

**OPINION BY:** PIERRE N. LEVAL

**OPINION:**

MEMORANDUM AND ORDER

PIERRE N. LEVAL, U.S.D.J.

This is an action for nonpayment of contributions to multiemployer employee benefit funds in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1145. Plaintiffs are trustees of certain employee welfare benefit plans for the Service Employees International Union, Local 32E, AFL-CIO. The defendants are 1453 Walton Realty Co., 1691 Eastburn Realty Co., 3340 Gates Place Realty Co., 1097-1099 Walton Realty Co., 3320 Kossuth Realty Co., 1363 Findlay Realty Co., and 1173-1175 Walton Realty Co., who are allegedly members of the Bronx Realty Advisory Board, Inc. Defendant J&F Management Corp. is alleged to be their agent. The trustees allege that defendants entered into a collective bargaining agreement with the Union, which defendants allegedly breached by failing to make required benefit plan contributions.

By order to show cause, the trustees seek a preliminary in injunction requiring defendants to make employee benefit payments pursuant to the terms of the collective bargaining agreement. J&F Management has not answered or otherwise appeared.

Background

Robert [*2] L. Chartier, President of the Union, and trustee of the employee benefit plans at issue, submits an affidavit in which he states that the parties entered into a collective bargaining agreement in which the defendants agreed to make periodic payments to the plaintiffs' employee benefit funds. Chartier personally signed the agreement on behalf of the Union and he states that he has personal knowledge that the defendants signed the agreement through their agent. Chartier states that the defendants have been delinquent in making the required contributions to the funds. According to Chartier, this delinquency amounts to thousands of dollars and "severely jeopardizes the financial stability of the Funds." Chartier Aff. at 2. The delinquency grows monthly. According to plaintiffs, defendants owe $ 58,756.00 for the period March 1990 through October 1992.

The Funds were established to provide health care, legal service, and retirement benefits to the employees. According to Chartier, underfunding of the plan jeopardizes the financial viability of the Funds, and thus also the Funds' ability to pay benefits to the employees. Chartier also affirms that nonpayment of contributions impairs [*3] the actuarial soundness of the funds. Plaintiffs submit copies of unpaid invoices issued to defendants for employer contributions to the Funds.

Under a 1989 agreement between the Union and Bronx Realty, as representative of its "Members" or "Employers," effective March 15, 1989 to March 14, 1992, each Employer agreed to (1) contribute $ 160.00 per month per employee to the Welfare Fund; (2) contribute $ 85.00 per month per employee, increased to $ 90.00 on April 1, 1990, and to $ 100.00 on April 1, 1991,

1992 U.S. Dist. LEXIS 17853, *; 15 Employee Benefits Cas. (BNA) 2942

to the Pension and Retirement Fund; (3) contribute $ 5.00 per month per employee to the Legal Services Fund; and (4) contribute $ 5.00 per month per employee to the Training Fund. See 1989 Agreement, Art. XXVII, A-D.

The agreement provides for enforcement of payment to the Funds:

If any Employer fails to make required reports or payments to the Welfare Fund, Pension and Retirement Fund, Legal Services Fund or Training Fund, the Trustees of the respective Funds or the Union may in their sole and absolute discretion take any action necessary, including but not limited to immediate arbitration and suits at law, to enforce such reports and payments, together with liquidated [*4] damages at the rate of ten (10%) percent per annum, any and all expenses of collection, including but not limited to counsel fees, arbitration costs and fees, and court costs. (Emphasis added.)

1989 Agreement, Art. XXVII, E. The agreement is "binding upon each and all of the agents, servants, representatives, executors, administrators and assigns of the Parties and upon the Employer-members of the Association and their agents, servants, representatives, administrators, executors and assigns." 1989 Agreement, Art. XXXIV.

Under a 1992 agreement between the Union and Bronx Realty, as representative of its Members or Employers, effective March 15, 1992 to March 14, 1995, each Employer agreed to (1) contribute $ 176.00 per month per employee to the Welfare Fund, increased to $ 193.00 on March 15, 1993, and to $ 213.00 on March 15, 1994; (2) contribute $ 100.00 per month per employee, increased to $ 1150.00 on October 1, 1994, to the Pension and Retirement Fund; (3) contribute $ 5.00 per month per employee to the Legal Services Fund; and (4) contribute $ 5.00 per month per employee to the Training Fund. See 1989 Agreement, Art. XXVII, A-D. The same enforcement provision and the same [*5] provision regarding which parties are bound as were contained in the 1989 agreement are contained in the 1992 agreement. Art. XXVII, Art. XXXIV. The 1992 Agreement also contains an exhibit entitled "Authorization for Collective Bargaining," to be executed by each Employer or Member. 1992 Agreement, Exh. B.

In addition, both the 1989 agreement and the 1992 agreement contain a provision permitting arbitration of disputes between parties or "between any Employer and the union." This provision does not appear to cover the Trustee's claims for contributions. It provides:

Any dispute, difference, controversy or grievance arising under this agreement between the Parties or between any Employer and the union or any of its members shall first be submitted in writing by the party claiming to be aggrieved to the other.

* * *

Disputes concerning failure to make reports or payments to the Funds set forth in Article XXVII shall commence by the service of a Notice of Delinquency on the Employer. If Payment is not made within ten (10) days the Union can commence an immediate arbitration proceeding.

1989 & 1992 Agreements, Art XXII.

Plaintiffs' counsel affirms that he has personal knowledge [*6] that Bronx Realty executed the two contracts.

Plaintiffs present two types of evidence that defendants are bound by these agreements: (1) that defendants were members of Bronx Realty and thus are bound by the agreement; and (2) that defendants executed documents that further show that they agreed to the 1989 and/or 1992 contracts.

Plaintiffs point out that defendants have submitted no evidence or affidavits contradicting their membership in Bronx Realty through April 9, 1991; that defendants' supplemental affirmation admits that one acceptance form "does appear to bind 1453 Walton Realty Co. to the 1989-1992 agreement . . . [and another] does appear to bind [1175] Walton Realty Co. to the 1989-1992 agreement." Plaintiffs contend that defendants' own submission of an April 9, 1991 letter from Bronx Realty listing defendants as members of Bronx Realty demonstrates that, at the least, defendants are bound by the terms of the 1989 agreement. Plaintiffs point out that the bulk of the payments became due prior to March 14, 1992. Plaintiffs further argue that defendants' have failed to provide any evidence of their "clear and unequivocal" withdrawal from Bronx Realty, and thus are bound [*7] by the 1992 agreement as well.

Plaintiffs also submit "acceptance" forms from each of the defendants to substantiate their claim that defendants agreed to the terms of the 1989 and/or 1992 agreements. An acceptance form dated October 10, 1988 and retroactive to January 12, 1988 is signed by and between the Union and J&F Management Corp. "AGTS.", 1097-99 Wlaotn [sic] Realty Co., Sol Gross & Joseph Friedman, of 1369 Coney Island Avenue, Brooklyn, N.Y. 11230. An acceptance form dated October 19, 1988 and retroactive to January 12, 1988 is signed by and between the Union and J&F Management Corp, "AGTS.", 3440 Gate Place Realty [sic], Joseph Friedman-Sol Gross, of 1369 Coney Island Avenue, Brooklyn, N.Y. 11230. An acceptance form dated October 19, 1988 and retroactive to January 12, 1988 is signed by and between

1992 U.S. Dist. LEXIS 17853, *; 15 Employee Benefits Cas. (BNA) 2942

the Union and J&F Management Corp., "AGTS.", 1363 Findlay Realty Co., "att:" Joseph Friedman, "Employer," of 1369 Coney Island Avenue, Brooklyn, NY 11230. An acceptance form dated October 20, 1988 and retroactive to January 12, 1988 is signed by and between the Union and 3320 Kossuth Realty Co. & J&F Management Corp. "AGTS.", Sol Gross & Joseph Friedman, of 1369 Coney Island [*8] Avenue, Brooklyn, N.Y. 11230. An acceptance form dated October 20, 1988 and retroactive to January 12, 1988 is signed by and between the Union and J&F Management Corp, "AGTS." 1691 Eastburn Realty Co., Sol Gross & Joseph Friedman, 1369 Coney Island Avenue, Brooklyn, NY 11230.

Each of these five acceptance forms states:

The undersigned agrees to assume, accept and comply with all the terms, conditions and provisions of the agreement entered into between the BRONX REALTY ADVISORY BOARD, INC. and the SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32E, A.F.L.-C.I.O., dated March 15, 1986 and any renewals and extensions thereof, and that the employees pursuant thereto shall receive the above wages and such benefits that exist thereunder, and such protection as it affords them.

Plaintiffs also submit two "WAGE & BENEFITS ACCEPTANCE" forms dated June 19, 1989 and retroactive to March 15, 1989. The first is signed by and between the Union and J&F Management Corp. "Agts." 1453 Walton Realty Co., c/o Sol Gross & Jos. Friedman, 1369 Coney Island Ave., Brooklyn, N.Y. 11230. The second is signed by and between the Union and J&F Management Corp. "AGTS" 1175 Walton Realty Company, c/o Sol Gross [*9]  & Joseph Friedman, 1369 Coney Island Avenue, Brooklyn, New York 11230. These two forms state:

This letter will confirm your agreement to accept the terms and conditions of the 1989-1992 Collective Bargaining Agreement between the Bronx Realty Advisory Board (BRAB) and Local 32E of the Service Employees International Union, AFL-CIO, covering the employees in the above referenced building.

Plaintiffs also submit copies of checks of each of the member defendants, signed with the same signature as the acceptance forms, which appears to be "JF y. M", made payable to the Union. These include checks from the accounts of 1173-1175 Walton Realty Co. (checks dated 12/2/91), 1363 Findlay Realty Co. (checks dated 10/26/89), 1691 Eastburn Realty Co. (checks dated 10/26/89), 1453 Walton Realty Co. (checks dated 12/3/91 and 10/26/89), 3320 Kossuth Realty Co. (checks dated 10/26/89), 3440 Gates Place Realty Co. (checks dated 10/26/89), and 1097-99 Walton Realty Co (checks

dated 10/26/89), as well as one check payable to the Union and signed by Sol Gross on the account of 1097-1099 Walton Realty Co (dated 7/17/90).

Counsel for defendants except J&F Management Corp. asserts that defendants do [*10] not know of an entity entitled J&F Management Corp. Defendants' counsel also notes that "the defendants have not been members of the Bronx Realty Advisory Board, Inc. since 1990." Defendants submit a letter dated April 9, 1991, from Ruben Klein, President of Bronx Realty, informing each of the defendants, among others, that their membership in the Bronx Realty association is cancelled for nonpayment of 1991 dues. Defendants assert that the 1989 Agreement expired on March 14, 1992 and that they did not sign a subsequent agreement. Defendants also note that J&F Management is not a member of Bronx Realty.

Discussion

Under section 515 of ERISA, "every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of the collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The trustees of a pension or welfare plan may enforce section 515 by seeking equitable relief in court:

A civil action may be brought . . . by a participant, beneficiary, or fiduciary [*11] (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3). Equitable relief, including injunctive relief, is available under ERISA for nonpayment of contributions to a pension or welfare trust fund. See, e.g., Laborers Fringe Benefit Funds v. Northwest Concrete and Construction Inc., 640 F.2d 1350 (6th Cir. 1981) (upholding permanent injunction); Van Drivers Union Local No. 392 v. Neal Mov. & Storage, 551 F. Supp. 429, 431-32 (N.D. Ohio 1982) (issuing preliminary & permanent injunction). Congress intended "to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act" and "to provide the full range of legal and equitable remedies available in both state and federal courts. . . ." H.R. Rep. No. 93-533, 93d Cong., 2d Sess. 17, reprinted in 1974 U.S. Code Cong.& Ad. News, p. [*12] 4639, 4655.

Case 1:06-cv-02177-RJL    Document 6    Filed 02/12/2007    Page 8 of 30

Page 4

1992 U.S. Dist. LEXIS 17853, *; 15 Employee Benefits Cas. (BNA) 2942

In order to obtain a preliminary injunction, plaintiffs must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). Irreparable injury "means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue. Id. The harm must be "neither remote nor speculative, but actual and imminent." Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotations and citations omitted).

In some circumstances, a preliminary injunction may issue requiring payment of pension, health, or welfare fund arrears and future payments in order to prevent irreparable harm to beneficiaries or to ensure the stability of such funds. Whelan v. Colgan, 602 F.2d 1060, 1062 (2d Cir. 1979) [*13] ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury"); see also United Steelworkers of America v. Textron, Inc., 836 F.2d 6, 8 (1st Cir. 1987) ("workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities"); United Steelworkers of America v. Ft. Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir. 1979) (denial of adequate medical care because of lack of insurance); Gould v. Lambert Excavating, Inc., 870 F.2d 1214, 1221-22 (7th Cir. 1989) (preliminary injunction requiring payment of prospective obligations to protect "actuarial soundness" of plan); Zotto v. Scovill, Inc., Slip. Op. No. 85-494 (D. Conn. Nov. 7, 1985) (reduction in medical benefits).

Judge Breyer of the Court of Appeals for the First Circuit has reasoned that courts may take judicial notice of general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired [*14] union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life. . . . We should then conclude that retired workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up in insurance payments). In short, taken together,

these facts would show harm that, in this sort of case, is 'irreparable.'. . .

Textron, 836 F.2d at 8. Of course, plaintiffs must still demonstrate irreparable injury to prevail. See e.g., Sheet Metal Workers' Internat'l Assoc., Local 206 v. West Coast Sheet Metal, 660 F. Supp. 1500, 1507 (S.D. Cal. 1987) (interruption in trust fund contributions is not per se irreparable harm).

A. Alleged Delinquencies Under the 1989 to 1992 Contract (Before March 14, 1992)

Plaintiffs argue that Congress explicitly [*15] has found "that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest . . ." 29 U.S.C. § 1001(a). Plaintiffs contend that defendants' "steadily mounting delinquencies threaten to undermine the financial stability of the funds," Pl. Mem. at 8, and that the uninterrupted flow of pension payments is crucial to the actuarial soundness of the funds. n1

n1 Plaintiffs point out that in recognition of that goal, courts have found an implicit cause of action to enforce interim payment of withdrawal liability mandated by ERISA, pending arbitration or final judgment. See, e.g., Trustees of the Retirement Fund of the Fur Mfg. Industry v. Lazar-Wisotzky, Inc., 550 F. Supp. 35, 38 (S.D.N.Y. 1982), aff'd without op., 738 F.2d 419 (2d Cir. 1984); United Retail & Wholesale Employees Teamsters Union, Local No. 115 Pension Plan v. Yahn & McDonnell, 787 F.2d 128, 133-34 (3d Cir. 1986), aff'd per curiam by an equally divided court, 481 U.S. 735, 95 L. Ed. 2d 692, 107 S. Ct. 2171 (1987).

[*16]

Defendants contend that plaintiffs' delay in seeking judicial relief may indicate that a movant is less likely to be able to show irreparable harm. See Nassau Blvd. Shell Service Station, Inc. v. Shell Oil Co., 869 F.2d 23, 24 (2d Cir. 1989) (per curiam) (termination of franchise agreement); Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) (trademark infringement). Here, defendants charge that plaintiffs delayed for over two years from the alleged initial breach in March 1990 before bringing suit. Plaintiffs assert that the breaches are of a growing and continuing importance, and that they have now reached the point of real harm to the Funds.

Plaintiffs have shown a risk of irreparable harm, sufficiently serious questions going to the merits to make

1992 U.S. Dist. LEXIS 17853, *; 15 Employee Benefits Cas. (BNA) 2942

them a fair ground for litigation, and a balance of hardships in their favor. The balance of equities tips in favor of granting preliminary relief, although not the extent of relief sought by plaintiffs. In order to ensure that adequate funds are available should plaintiffs prevail on the merits, the defendants are directed to deposit into the court an amount [*17] equal to the claimed delinquencies for the period up to March 14, 1992.

B. Alleged Delinquencies Under the 1992-1995 Contract (After March 14, 1992)

Defendants assert that the NLRB has primary jurisdiction over that part of this action which seeks relief for alleged nonpayment after expiration of the 1989 agreement on March 14, 1992. See Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 98 L. Ed. 2d 936, 108 S. Ct. 830 (1988) (NLRB has primary jurisdiction over post-contractual pension fund obligations of employer).

Plaintiffs counter that, because defendants failed to give a timely and unequivocal notice to the union of their withdrawal from Bronx Realty prior to the negotiation and execution of the 1992 agreement, defendants are bound by its terms. See O'Hare v. General Marine Transport Corp., 740 F.2d 160, 168-69 (2d Cir. 1984), cert. denied 469 U.S. 1212, 84 L. Ed. 2d 329, 105 S. Ct. 1181 (1985); see also NLRB v. Spun-Jee Corp., 385 F.2d 379, 382 (2d Cir. 1967); NLRB v. Paskesz, 405 F.2d 1201 (2d Cir. 1969) (per curiam) (cancellation of membership [*18] in multiemployer bargaining unit because of nonpayment of dues does not relieve employer of obligations of new contract). "The National Labor Relations Board has required notice of withdrawal from the bargaining unit to be clear and unequivocal." Trustees of Colorado Pipe v. LPCC, Inc., 549 F. Supp. 833, 835 (D.C. Colo. 1982); accord NLRB v. Tulsa Sheetmetal Works Inc., 367 F.2d 55 (10th Cir. 1966).

Whether defendants have obligations after March 14, 1992 is not sufficiently clear for the court to grant any preliminary relief at this time.

C. Arbitration

Defendants contend that the arbitration provisions in the 1989 and 1992 agreements bind the trustees and dictate that the trustees' claims under ERISA must first be brought to arbitration. In Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 80 L. Ed. 2d 366, 104 S. Ct. 1844 (1984), the Supreme Court held that there is no presumption in favor of arbitration of disputes between plan trustees and employers, that trustees are not bound to arbitrate as third party beneficiaries of a contract be-

tween employers and a union, and that the question of whether trustees [*19] are bound to arbitrate disputes with employers is governed by the intent of the parties. See also O'Hare, 740 F.2d at 168. n2 Plaintiffs point out that under the terms of the Agreement, "the Trustees of the respective Funds . . . may in their sole and absolute discretion take any action necessary, including but not limited to immediate arbitration and suits at law." 1989 & 1992 Agreements, Art. XXVII(E). The arbitration provision, in contrast, applies to disputes between the parties to the agreement, or between an Employer and the Union. Art. XXII. The arbitration provision does not extend by its terms to the trustees of the Funds. The separate provision regarding the power of the trustees to "take any action necessary, including . . . suits at law," further undermines defendants' position that the trustees are bound to arbitrate this dispute. As in O'Hare, 740 F.2d at 168, here "the Agreement's general arbitration provision did not apply to the Trustees . . . ." See also, Local Union 597 v. Mosbeck Indus. Equip., Inc., 856 F.2d 837 (7th Cir. 1988); Bugher v. Consolidated X-Ray Service Corp., 705 F.2d 1426, 1430 (5th Cir. 1983), [*20] cert. denied 467 U.S. 1207, 81 L. Ed. 2d 348, 104 S. Ct. 2391 (1984).

n2 Defendants incorrectly cite ILGWU National Retirement Fund v. Levy Bros. Frocks, Inc., 846 F.2d 879 (2d Cir. 1988) for the proposition that trustees are bound to arbitrate contribution disputes with employers. Levy Bros., however, involved not contributions under the terms of an agreement, but rather the statutory duty to arbitrate questions of withdrawal liability.

Conclusion

Plaintiffs' motion for preliminary injunction is granted in part and denied in part. Pending disposition on the merits, defendants are directed to pay into the court (or to an escrow agent reasonably agreeable to plaintiffs) an amount equal to the sum of the delinquencies claimed by plaintiffs to have accrued prior to March 14, 1992.

Dated: New York, N.Y.
November 24, 1992

SO ORDERED:

Pierre N. Leval, U.S.D.J.

LEXSEE 25 EBC 1344



Positive
As of: Jan 17, 2007

**DEMOLITION WORKERS UNION, LOCAL 95 INSURANCE, ANNUITY and PENSION FUNDS, by their Trustees, Christine McKenna, Phillip Chillak, Sr., Kenneth Frolich and Anthony Noto, Plaintiffs, -against- MACKROYCE CONTRACTING CORP. and MACKROYCE DISMANTLING, LTD., Defendants. MACKROYCE CONTRACTING CORP. and MACKROYCE DISMANTLING, LTD., Third-Party Plaintiffs, -against- MASON TENDERS DISTRICT COUNCIL WELFARE FUND, PENSION FUND AND ANNUITY FUND, ASBESTOS TRAINING PROGRAM FUND, INDUSTRY FUND, LEGAL SERVICES, Third-Party Defendants.**

**97 Civ. 4094 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2000 U.S. Dist. LEXIS 3548; 25 Employee Benefits Cas. (BNA) 1344**

**March 17, 2000, Decided**
**March 22, 2000, Filed**

**DISPOSITION:** [*1] Summary judgment granted to the Funds in the amount of $ 149,058.56. Summary judgment denied as to the amount of $ 142,198.72. Funds' request for a preliminary injunction as to the amount remaining in dispute, $ 142,198.72, granted.

**COUNSEL:** For DEMOLITION WORKERS UNION, LOCAL 95 INSURANCE, ANNUITY AND PENSION FUNDS, plaintiffs: John Edward Daly, Proskauer Rose LLP, New York, NY.

For MACKROYCE CONTRACTING CORP., defendant: Steven M. Coren, Coren & Braun, P.C., New York, NY.

For MACKROYCE CONTRACTING CORP., third-party plaintiff: Steven M. Coren, Coren & Braun, P.C., New York, NY.

For MASON TENDERS DISTRICT COUNCIL WELFARE FUND, PENSION FUND AND ANNUITY FUND, ASBESTOS TRAINING PROGRAM FUND, INDUSTRY FUND, LEGAL SERVICES FUND, NEW YORK STATE LABORERS-EMPLOYERS

COOPERATION AND EDUCATION TRUST FUND, NEW YORK LABORERS' HEALTH AND SAFETY TRUST FUND, BUILDING CONTRACTORS ASSOCIATION INDUSTRY ADVANCEMENT PROGRAM, JOHN J. VIRGA, STEVEN STEVEN HAMMOND, third-party defendants: Lawrence A. Kravitz, Gorlick, Kravitz & Listhaus, p.c., New York, NY.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiffs are the Insurance, Annuity [*2] and Pension Funds (collectively "the Funds") of the Demolition Workers Union, Local 95 ("Local 95"). Through their trustees, they claim that defendants Mackroyce Contracting Corp. ("Mackroyce Contracting") and Mackroyce Dismantling, Ltd. ("Mackroyce Dismantling") (collectively "Mackroyce") have refused to comply with their

2000 U.S. Dist. LEXIS 3548, *; 25 Employee Benefits Cas. (BNA) 1344

obligations under the parties' Collective Bargaining Agreement ("CBA") to contribute to the Funds. Plaintiffs move for summary judgment or, in the alternative, a preliminary injunction. For the reasons that follow, this Court grants partial summary judgment, and grants injunctive relief as to the remainder of the amount claimed.

## BACKGROUND

The Funds are employee insurance benefit funds within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1), in that they were established by Local 95 as an employee organization, and are multi-employer funds within the meaning of ERISA section 3(37), 29 U.S.C. § 1002(37). The Funds are collectively bargained funds created pursuant to 29 U.S.C. § 186(c)(5), and are maintained pursuant to [*3] the CBA between Local 95 and Mackroyce.

On February 15, 1996, Mackroyce Contracting and Local 95 entered into the CBA, which covered the period from July 1, 1993 through June 30, 1997. n1 Under the CBA, Mackroyce Contracting was obliged to contribute to the Funds, retroactive to July 1, 1993. Mackroyce Dismantling, by an October 15, 1996 letter agreement signed by its owner and president Peter D'Agostino ("D'Agostino"), agreed to be a party to the CBA for the period from February 1, 1995 through June 30, 1997. Since October of 1996, all payments or remittance reports received from Mackroyce have been submitted by Mackroyce Dismantling.

n1 The Funds' complaint seeks recovery for periods covered by the 1993-1997 CBA. However, the Funds have expressed their intent to pursue later delinquencies. (See Funds' Memo. at 12 n.4). Because any such delinquencies would arise from breach of a new collective bargaining agreement, the Funds should institute a new action to pursue those alleged delinquencies.

As to the [*4] insurance and annuity funds, the CBA provides:

(a) The Employer shall . . . make payments on each Friday to Local No. 95 Insurance Trust Fund and Annuity Trust Fund . . . . The monies so received shall be used by the Trustees herein after named, of said Trust Funds, for the sole purpose of providing benefits as specified in their respective plans.
* * *

(e) Benefits provided by the Plans shall only be available to workers covered by this Agreement for whom the Employer has made timely reports of their employment and payments as required by subdivision (a) hereof, and who otherwise qualify for benefits under the eligibility requirements of the Plans adopted by the Trustees. Failure of an Employer to make reports and payments as required herein, which result in a worker's loss of benefits shall render the Employer liable to said workers affected by the Employer's breach for any loss of benefits sustained.

(CBA at P 29). Concerning the pension fund, the CBA states:

(a) The Employer shall make payments on each Friday to Local 95 Pension Trust Fund in the amount and manner set forth below.

(b) The Pension Trust Fund is to be used for the purchasing [*5] and/or providing of pension or retirement benefits for said workers as determined by the Trustees of said Fund.

(CBA at P 30).

The CBA also recites the amount of contribution Mackroyce is required to pay to the Funds:

Employer contributions to the Funds shall be as follows during the term of the Agreement: starting July 1, 1994, on each Friday, the Employer agrees to make contributions to the . . . Local 95 Pension, Insurance and Annuity Trust Funds at 18% of gross pay: 10% into the Pension Fund, 4% into the Insurance Fund, and 4% into the Annuity Fund.

(CBA at P 31).

As of October 6, 1998, the Funds claim that Mackroyce was delinquent in the amount of $ 291,257.28. This figure is based on two audits of Mackroyce employee records made in December 1996 and December

Page 3

2000 U.S. Dist. LEXIS 3548, *; 25 Employee Benefits Cas. (BNA) 1344

1997 by Buchbinder, Tunick & Co., LLP ("Buchbinder"). Mackroyce challenges the audits, claiming that the auditors included in the calculations hours worked outside the coverage of the CBA and made unreasonable assumptions about certain employee codes untilized in Mackroyce's employee records. In addition to the alleged delinquent contributions, the Funds claim $ 87,404 in interest, $ 87,404 in statutory [*6] penalties, $ 27,807.75 in attorneys' fees, $ 1,340.41 in costs, and $ 57,322.75 in auditors' fees. As of October 6, 1998, then, the Funds ask for a total of $ 552,536.19.

### DISCUSSION

#### A. Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This Court must view the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Once the movant presents appropriate support demonstrating that there is no genuine issue of material fact, the burden shifts to the nonmoving party to present similar support setting forth specific facts about which a genuine issue remains. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Mere conclusory allegations will not suffice. Rather, the nonmoving party must present "significant probative evidence" that a [*7] factual dispute exists. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 249.

#### B. Liability

ERISA Section 515 provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 502 of ERISA, 29 U.S.C. § 1132(a)(3), grants the trustees of a plan the right to bring an action in federal district court to enforce an employer's duty under section 515. See Benson v. Brower's

Moving & Storage, Inc., 907 F.2d 310, 312-13 (2d Cir. 1990)("ERISA Sections 502 and 515 clearly give a district court subject matter jurisdiction to hear an action brought by benefit plan trustees to enforce an employer's promise to make contributions.").

In this case, neither party disputes the validity of the CBA. Rather, Mackroyce argues that there are material issues as to what its obligations are "under the terms and conditions [*8] of" the CBA. 29 U.S.C. § 1145. Specifically, Mackroyce argues that the delinquencies claimed by the Funds, which are based on the Buchbinder audits of Mackroyce's records, are overstated because the auditor based his calculations on: (1) work performed outside the geographic jurisdiction of Local 95; (2) hours worked over a 35-hour per worker, per week cap used in the industry for calculation of contributions due the Funds; (3) hours worked by non-Union members; and (4) hours worked outside the trade jurisdiction of Local 95.

An employer's defenses to a section 515 action are very limited. "Once an employer knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the union's ability to enforce the contract as a whole." Benson, 907 F.2d at 314. The Second Circuit has stated that only two defenses are available: (1) that the contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable). Benson, 907 F.2d at 314; see also Mason Tenders Dist. Council Welfare Fund v. Liberty Contracting Corp., 1998 U.S. Dist. LEXIS 13300, No. 97 Civ. 5568 (HB), 1998 WL 545298, [*9] at *3 (S.D.N.Y. Aug. 27, 1998); National Elec. Benefit Fund v. Heary Bros. Lightning Protection Co., 931 F. Supp. 169, 180 (W.D.N.Y. 1995).

However, one Second Circuit decision noted that another, more basic defense exists in that ERISA section 515 "requires contributions only 'in accordance with the terms and conditions of' the [collective bargaining agreement]." DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 653 (2d Cir. 1994); see also Hanley v. Prudential Recreation Corp., 1999 U.S. Dist. LEXIS 21487, No. 96 CV 27 (SJ), 1999 WL 184110, at *2 (E.D.N.Y. Mar. 30, 1999). Thus, "although a variety of contract defenses would not preclude [plaintiffs] from enforcing their right to collect payments pursuant to the [CBA], [they] are not entitled to enforce a nonexistent contractual obligation.'" DeVito, 38 F.3d at 653-54 (quoting Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 138 (3d Cir. 1993)).

Therefore, this Court must evaluate Mackroyce's obligations to the Funds under the terms and conditions of the CBA. In construing the CBA, this Court is mindful

Case 1:06-cv-02177-RJL    Document 6    Filed 02/12/2007    Page 13 of 30

Page 4

2000 U.S. Dist. LEXIS 3548, *; 25 Employee Benefits Cas. (BNA) 1344

that "the determination [*10] of whether a contract contains ambiguous language is a question of law." Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans v. Mauro's Plumbing, Heating & Fire Suppression, Inc., 84 F. Supp. 2d 344, 2000 U.S. Dist. LEXIS 1434, 2000 WL 194555, at *7 (N.D.N.Y. 2000)(citing Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998)). "A contract provision is ambiguous when 'it is reasonably susceptible to more than one reading.' If the contract language is clear, summary judgment is proper." Id. (citations and quotations omitted). Further, while extrinsic evidence may be used to shed light on ambiguous collective bargaining agreements, it cannot be used when an agreement is unambiguous. Id.; see also Alston v. Dollar Rent A Car Sys., Inc., 1998 U.S. Dist. LEXIS 13084, No. 96 Civ. 7531 (JSM), 1998 WL 531828, at *3 (S.D.N.Y. Aug. 24, 1998).

### 1. Geographical Limitations of the CBA

Mackroyce contends that it "appears that there is an issue as to whether Defendants have an obligation to contribute for work performed outside of New York City." (Steven Coren 3/4/99 Aff. at P 4). There does appear to be a question as to whether [*11] the Local 95 Charter was revised in 1996 in such a way that the jurisdiction of Local 95 was limited to New York City. (Id.) The CBA, however, clearly states that "the Union's jurisdiction is limited to work performed within the States of New York, New Jersey and Connecticut." (CBA at P 1(c)). The CBA was signed before any reaffiliation by Local 95. While a reaffiliation may have limited Local 95's jurisdiction, Mackroyce offers no reason (nor can this Court divine) why that would override the terms of the existing CBA. Therefore, the clear terms of the CBA must prevail, and hours worked in New York, New Jersey, and Connecticut are properly included in the computation of Mackroyce's obligations to the Funds.

### 2. 35-Hour Limitation

Mackroyce asserts that "industry practice holds that the maximum hours subject to contribution in any pay period is thirty-five hours," and that the Funds' audit disregarded this in computing the contributions owed by Mackroyce. (D'Agostino 9/14/98 Aff. at P 5; see also D'Agostino 3/99 Aff. at P 12). However, the CBA clearly states that contributions to the Funds are to be made at a rate of "18% of gross pay: 10% into the Pension Fund, 4% into [*12] the Insurance Fund, and 4% into the Annuity Fund." (CBA P 31). There is no language which indicates that the amount of payroll used as a basis for calculating contributions should be capped at 35 hours per worker, per week. Further, the CBA contains a merger clause which states that the CBA "represents the full and complete understanding of the parties." (CBA P

38). Therefore, this Court finds that the CBA is unambiguous in its exclusion of a 35-hour cap on wages subject to contribution, and need not look to any extrinsic evidence offered by Mackroyce.

### 3. Inclusion of Non-Union Workers' Hours

Mackroyce argues that "there is some question as to whether contribution obligations towards Plaintiff funds are required only for the work of those employees who are members of Local 95." (D'Agostino 3/99 Aff. P 6). This Court disagrees.

Case law from this Circuit heavily supports the Funds' claim that the CBA covers both union and non-union employees. In Central Pension Fund of the Int'l Union of Operating Engineers & Participating Employers v. Murphy's Tire, Inc., 1998 U.S. Dist. LEXIS 19369, No. 97- CV-814, 1998 WL 865594 (N.D.N.Y. Dec. 9, 1998), Judge McAvoy of the Northern District of New York [*13] confronted a situation similar to that faced by this Court. Judge McAvoy summarized a decision of the Sixth Circuit, Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co., 749 F.2d 315 (6th Cir. 1984)(en banc), as follows:

> In rejecting defendant's argument that the collective bargaining agreement and employee benefit plans obligated contributions for only union members, the Kohn court set forth several guiding factors. First, it explained that the "presence in the [collective bargaining agreement] of a recognition clause designating the union as the exclusive bargaining agent for all employees indicates that fringe benefit contributions are required for both union and non-union members." Second, it noted that because the collective bargaining agreement defined employees by job classification, all employees within those job classifications must be covered by the collective bargaining agreement, regardless of union membership. Third, it found that the absence of any language in the collective bargaining agreement distinguishing between union and non-union employees indicates that it covered all employees. Fourth, it explained that the union shop [*14] clause, which required defendant's employees to maintain membership in the union, "have [sic] been construed to require only payment of union dues and not union membership." It also noted that to equate employees covered

Case 1:06-cv-02177-RJL    Document 6    Filed 02/12/2007    Page 14 of 30

Page 5

2000 U.S. Dist. LEXIS 3548, *; 25 Employee Benefits Cas. (BNA) 1344

by the agreement with union members would render the union shop clause superfluous. Accordingly, Kohn held that the district court erred in interpreting the contract as requiring contributions for only defendant's union member employees.

Murphy's Tire, 1998 U.S. Dist. LEXIS 19369, *13-14, 1998 WL 865594 at *5 (quoting Kohn, 749 F.2d at 318-19). Judge McAvoy went on to find that the collective bargaining agreement was very similar to the one in Kohn, and held that both union members and non-members were covered by the agreement. See also Mauro's Plumbing, 2000 WL 194555, at *8 (quoting Murphy's Tire's summarization of Teamsters, and finding a collective bargaining agreement to cover both union and non-union employees).

In this case, all factors weigh in the Funds' favor. First, the recognition clause in the CBA, (see CBA P 1(a)), cited by the defendants themselves, (see D'Agostino 3/99 Aff. at P 6), undercuts their argument [*15] rather than supports it. Second, as will be discussed more fully in the next section, the CBA defines covered employees by the job classification of "demolition," (see CBA P 21), allowing for the inference that union members and non-members alike are covered. Third, this Court does not find any language in the CBA distinguishing union from non-union workers. Finally, the CBA contains a union shop clause, (See CBA P 1(c)), and equating covered employees with union members would render the clause meaningless.

Beyond Kohn, Murphy's Tire and Mauro's Plumbing both noted that "other courts have consistently construed collective bargaining agreements as unequivocally obligating an employer to contribute to an employee benefit plan for all of its employees, irrespective of union membership." Murphy's Tire, 1998 WL 865594, at *5 (citing cases from several circuits); Mauro's Plumbing, 2000 WL 194555, at *8 (same). Further, as noted in both cases and by plaintiffs in this case, "the absence of any distinction in the agreements between union and non-union members can be easily explained: the law does not permit such a distinction. . . . An employer [*16] may not encourage or discourage membership by means of discrimination." Murphy's Tire, 1998 WL 865594, at *6 (quoting Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 624 (3d Cir. 1984)(citing 29 U.S.C. § 158(a)(3))); Mauro's Plumbing, 2000 WL 194555, at *9 (quoting same).

For all of the above reasons, this Court finds that the CBA covers both Local 95 members and non-members.

**4. Trade Classifications Covered by the CBA**

Mackroyce contests the Funds' audit on the grounds that work in trades beyond the scope of the CBA was considered in calculating Mackroyce's contributions. The CBA clearly states the type of work it covers:

> (a) The work covered by this Agreement is demolition. The term "demolition" as herein used shall, in addition to the foregoing and its usual and customary meaning, be deemed to include all work in:
>
>> (i) The removal and loading of all material and debris while demolition of the building is in progress and loading is done by hand;
>> (ii) The operation of jackhammers and chippers except when such operation is in connection with the drilling of holes for blasting;
>> (iii) Construction [*17] of water and air lines for use of workers in their work;
>> (iv) Burning, in connection with work, which is otherwise within the jurisdiction of the Union.
>
> ***
>
> (e) Construction and removal of wood chutes and wood bridges shall be demolition as to which the Union has jurisdiction, but construction of steel chutes, steel bridges, or patented scaffolds shall not be demolition as to which the Union has jurisdiction, but removal of steel chutes or patented scaffolds is demolition as to which the Union has jurisdiction.

(CBA at P 21). The real controversy appears to be not what types of work are covered by the CBA, but rather whether the Funds' audit considered only hours expended in such labor in reaching its delinquency figures. This issue will be considered in the next section of this Opinion, which addresses damages.

**C. Damages**

**1. Mackroyce's Delinquencies**

First, Mackroyce apparently does not dispute some of the delinquencies claimed by the Funds. The Funds

claim that Mackroyce owed contributions in the amount of $ 447,183.73, and that Mackroyce has paid only $ 155,926.45 of this amount. Thus the Funds claim a delinquency of $ 291,257.28. Based on the review of Mackroyce's [*18] accountant, Lana Coren, Mackroyce disputes $ 143,754.70 of the $ 291,257.28 claimed. (See Lana Coren 3/4/99 Aff., Exs. 11-12; Daly 3/19/99 Aff., Ex. 4). n2 In addition, there appears to be a question as to whether Mackroyce paid an additional $ 12,784.65 to the Funds beyond the $ 155,926.45 the Funds admit was paid. n3 Therefore, $ 134,717.93 ($ 291,257.28 - $ 143,754.70 - $ 12,784.65) is indisputably owed the Funds. Further, in light of this Court's holdings in the liability section of this opinion, summary judgment is proper as to the amounts contested on the basis of the Funds' geographic jurisdiction and the asserted 35-hour cap. These amounts total $ 14,340.63. (See Daly 3/19/99 Aff., Ex. 4). Thus, summary judgment is proper as to $ 149,058.56 (134,717.93 + 14,340.63). Under the CBA, the Funds are owed interest and statutory damages based on this amount, and the Funds auditors' and attorneys' fees are also to be reimbursed. The Funds are therefore directed to submit to the Court updated calculations of the amounts owed within fifteen days of this Opinion. Any Mackroyce opposition to the Funds' calculations is to be submitted within thirty days of this Opinion.

n2 John Daly, attorney for the Funds, computed the amount contested by Mackroyce as $ 140,186.94, but the apparently forgot to add the $ 3,567.76 contested as "Out of Fund Jurisdiction" in 1995-96. (See Daly 3/19/99 Aff., Ex. 4). This Court has compared Daly's calculations with Lana Coren's review of the Funds' audits, (see Lana Coren 3/4/99 Aff., Exs. 10-12), and finds Daly's computations otherwise accurate.

[*19]

n3 Mackroyce contends that it paid this additional $ 12,784.65 to the Funds in the form of Check # 6974. (See Thomas Florio ("Florio") Aff. P 4). While the other checks which Florio cites match up with checks of which the Funds admit receipt (and of which they, unlike Mackroyce, provide copies), the Funds do not admit to receiving Check # 6974. While the affidavit of Florio, a manager for Mackroyce Dismantling, is sufficient to deny summary judgment as to this amount, Mackroyce will need to submit a copy of the check to avoid judgment against them as to the alleged amount of the check.

### 2. Disputed Damages

Mackroyce contests the following: $ 83,723.82 as based on incorrect job classifications by the Funds, $ 43,777.83 as based on work outside the job classifications covered by the CBA, and $ 1,912.42 as auditor's errors. Thus, $ 129,414.07 remains in dispute. n4 In relation to this amount, Mackroyce asserts that Buchbinder made miscalculations and improper assumptions in its audit of Mackroyce's employee records. The Funds respond that any uncertainties contained in their audits are [*20] a result of the inadequacy of Mackroyce's records.

n4 This amount is above and beyond the $ 12,784.65 which Mackroyce asserts that it paid by Check # 6974. See supra n.3.

Under ERISA, an employer has general recordkeeping and reporting requirements:

Every employer shall, in accordance with regulations prescribed by the Secretary, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees.

29 U.S.C. § 1059(a)(1); see also Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 695 (6th Cir. 1994); Brick Masons Pension Trust v. Industrial Fence & Supply, Inc., 839 F.2d 1333, 1337-38 (9th Cir. 1988); Combs v. King, 764 F.2d 818, 823 (11th Cir. 1985); Grabois v. Action Acoustics, Inc., 1995 U.S. Dist. LEXIS 16680, No. 94 Civ. 7386 (NRB), 1995 WL 662127, at *2 (S.D.N.Y. Nov. 9, 1995). Indeed, ERISA "was enacted, at least in part, [*21] to increase the information and data available to participants," and "employers were to play integral roles in the disclosure process." Combs, 764 F.2d at 823. "Since the employer is in the best position to know the number of hours worked, courts have determined that the policies of ERISA are advanced by the imposition of a burden that reflects the employer's duties under ERISA." Local 282 Welfare Trust Fund v. A. Morrison Trucking, Inc., 1993 U.S. Dist. LEXIS 4741, No. CV-92-2076 (JMA), 1993 WL 120081, at *1 (E.D.N.Y. March 30, 1993).

While the Second Circuit has not yet decided the applicable standard where a benefit fund challenges the

Page 7

2000 U.S. Dist. LEXIS 3548, *; 25 Employee Benefits Cas. (BNA) 1344

contributions owed by an employer and claims that the employer's records are inadequate, other circuits have weighed in on the issue. See Grimaldi Concrete, 30 F.3d at 696-97; Brick Masons, 839 F.2d at 1338; Combs, 764 F.2d at 825-826. These courts have held that

> "a fund's or trustee's production of evidence raising genuine questions concerning an employer's failure to maintain adequate records shifts to the employer the burden of coming forward with evidence either of the precise number [*22] of hours worked or to negate the reasonableness of the inferences to be drawn from the plaintiff fund's evidence. . . . If the employer fails to produce such evidence, the court may award damages to the trustee even where the damages are an approximate amount."

Hanley v. Orient Beach Club, Inc., 1998 U.S. Dist. LEXIS 1700, *17, No. 96 Civ. 4478 (AJP)(MGC), 1998 WL 65990, at *5 (S.D.N.Y. Feb. 18, 1998)(quoting Grabois, 1995 WL 662127, at *2-3 (citations omitted)). Beyond Orient Beach Club and Grabois, other courts in this circuit have acknowledged the usefulness of the burden-shifting analysis adopted by other circuits. See, e.g., Brown v. Dominic Prisco Transport, Inc., 1997 U.S. Dist. LEXIS 23709, No. CV-95-1121 (ADS), 1997 WL 1093463, at *10 (E.D.N.Y. Aug. 16, 1997); Bourgal v. Robco Contracting Enters., Ltd., 969 F. Supp. 854, 864-65 (E.D.N.Y. 1997), aff'd, 182 F.3d 898, 1999 WL 533791 (2d Cir. 1999)(table); A. Morrison Trucking, 1993 WL 120081, at *1.

This Court, however, will not employ the burden-shifting analysis described above at the summary judgment stage. See Illinois Conf. of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking, 71 F.3d 1361, 1367 (7th Cir. 1995) [*23] (noting that neither Combs nor Brick Masons involved a summary judgment motion by plaintiffs, and stating that "we do not believe that Gilbert Trucking's failure to come forward with documentary evidence to oppose the Fund's summary judgment motion was fatal at this stage of the proceedings."); see also Central Pension Fund of the Int'l Union of Operating Engineers & Participating Employers v. Murphy's Tire, Inc., 1998 U.S. Dist. LEXIS 19369, 97-C V-814, 1998 WL 865594, at *8 (N.D.N.Y. Dec. 9, 1998)(agreeing with Gilbert Trucking and declining to employ the burden-shifting analysis on a motion for summary judgment); Dominic Prisco Transport, 1997 U.S. Dist. LEXIS 23709, 1997 WL 1093463, at *10 (E.D.N.Y. Aug. 16,

1997)(agreeing with Gilbert Trucking and referring the matter of damages to a magistrate judge); Bourgal, 969 F. Supp. at 865 (E.D.N.Y. 1997)(same). Thus, this Court will not now opine as to the reasonableness of the Buchbinder audit or the adequacy of Mackroyce's employee records. Those inquiries are properly left for trial. Rather, "the proper question [on] summary judgment is whether [Mackroyce] has submitted evidence that raises a factual dispute as to the amount [*24] of damages owing [the Funds]." Murphy's Tire, 1998 WL 865594, at *8.

This Court finds that Mackroyce has shown that questions remain as to whether the auditors based their calculations, in part, on hours expended on labor other than "demolition." Mackroyce employee records utilize "department codes" to classify different types of workers. A cursory review of the Buchbinder audits reveals that it includes in its calculations hours expended by workers under the following codes: 4, 5, 6, 7, 8, 10, 13, 14, 15, 16, 17, 18, 20, 30, 32. (See Perlman 5/8/98 Aff., Exs. D & E). Among these codes are trades which may not involve demolition work: laborer (4), yard men (5), runners (6), asbestos (7), security (8), maintenance (10), N.J. carpenter (18), toolman (20), excavation (30), and furniture movers (32). (See Lana Coren 3/4/99 Aff., Ex. 15). n5 Further, codes 13-17 are "blank" codes, unassigned to any particular type of work. (Id.). n6 Because further inquiry into the propriety of the auditors' calculations and the adequacy of Mackroyce's employee records is needed, this Court must deny the Funds' motion for summary judgment as to the amounts remaining in dispute. [*25] n7

n5 In the code classification sheet submitted by Mackroyce, the codes listed as under the jurisdiction of Local 95 are 95 (barman), 96 (barman assistant), and 97 (barman helper). (See Lana Coren 3/4/99 Aff., Ex. 15).

n6 Mackroyce claims that the time sheets submitted with its opposition papers clarify which hours are properly included in the contribution calculations. (See Lana Coren 3/4/99 Aff. PP 23-24 & Ex. 10). However, after perusing these time sheets, this Court is unable, without assistance, to discern how they do so. D'Agostino, in his first affidavit, stated that though "available records were furnished to Plaintiffs' auditors at the time of the audit, [the Funds] failed to make appropriate inquiry regarding the trade classifications of Mackroyce employees." (D'Agostino 9/14/98 Aff. at P 4). Considering the importance which Mackroyce attributes to the time sheets, this Court

wonders why Mackroyce did not produce the time sheets to Buchbinder for use in its audits. In any event, any burden-shifting involving the adequacy of Mackroyce's employee records is properly left for trial.

[*26]

n7 It should be emphasized that, at trial, the burden-shifting analysis described above will be utilized.

### D. Preliminary Injunction

The Funds also move for a preliminary injunction requiring Mackroyce to pay the alleged delinquencies to the Funds or to this Court. This Court must now determine whether such an injunction is proper as to the amount remaining in dispute.

"Equitable relief, including injunctive relief, is available under ERISA for nonpayment of contributions to a . . . fund." Chartier v. J&F Management Corp., 1992 U.S. Dist. LEXIS 17853, *11, No. 92 Civ. 7272 (PNL), 1992 WL 367115, at *4 (S.D.N.Y. Nov. 25, 1992) (citations omitted). A party is entitled to a preliminary injunction if it demonstrates that: (1) it will suffer irreparable harm in the absence of an injunction, and (2) either (a) it will likely be successful on the merits, or (b) there are sufficiently serious questions on the merits making them fair ground for litigation, and the balance of hardships decidedly favors the moving party. Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 998-99 (2d Cir. 1997). [*27] For the following reasons, this Court grants the Funds' motion for a preliminary injunction, with the contributions in dispute to paid to the Court.

### 1. Irreparable Harm

"To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent." Seide v. Crest Color, Inc., 835 F. Supp. 732, 735 (S.D.N.Y. 1993)(quotations omitted). Further, "a monetary loss will not suffice [for a showing of irreparable harm] unless the movant provides evidence of damage that cannot be rectified by financial compensation." Id. (citations and quotations omitted). However, "ERISA collection cases are exceptions from the general rule of equity that equity will not enjoin either prohibitively or mandatorily the payment of money." Central States v. Hester, 1984 U.S. Dist. LEXIS 15154, *5-6, No. 84 C 3516 (N.D. Ill. July 6, 1984).

The Funds claim that, in the absence of an injunction, "(i) the actuarial soundness of the pension fund will be threatened; (ii) the ability of union workers to collect their benefits will be endangered; [and] (iii) there will be

a substantial danger that unsecured funds [*28] may not be collected." (Funds' Memo. at 22-23). The Funds have submitted evidence of a substantial danger that the disputed funds may not be collected. Mackroyce has, within the past few years, twice filed for bankruptcy. (See Daly Aff. PP 2-8, Exhs. 1-7). Further, various entities have already obtained numerous judgments against Mackroyce. See, e.g., Mason Tenders Dist. Council Welfare Fund v. Mackroyce Constr. Corp., 1998 U.S. Dist. LEXIS 5565, No. 96 Civ. 4693 (SAS), 1998 WL 193075 (S.D.N.Y. Apr. 20, 1998). "Several courts have found irreparable harm threatened, in part, by a defendant employer's bleak financial condition." Laborers' Int'l Union of America Nat'l (Ind.) Pension Fund v. Pacific Ascorp, 1990 U.S. Dist. LEXIS 4930, *11, No. 90-613 (D.D.C. May 30, 1990)(citing cases). Therefore, Mackroyce's apparently precarious financial condition provides grounds for a finding of irreparable harm in this case.

Further, the Funds have submitted evidence showing the precariousness of the Funds' actuarial soundness, and hence have shown that union members' ability to collect benefits may be endangered. (See Neibloom Aff. PP 3-11 & Ex. A). However, this argument cuts [*29] both ways for the Funds. If the money is turned over to the Funds but the Funds are unsuccessful at the trial on damages, Mackroyce has a legitimate concern that it may not recoup this money due to the Funds' precarious financial situation. Hence, with both parties evidencing financial unsteadiness, the proper resolution, should a preliminary injunction be called for, is that Mackroyce pay the disputed Funds into the Court.

### 2. Likelihood of Success on the Merits/Balance of Hardships

With the remaining issues regarding damages rather muddied, this Court is unable to say that the Funds are likely to gain a judgment as to the disputed amounts. However, there clearly are fair grounds for litigation as the amount of damages; the relevant question is whether the balance of hardships falls upon the Funds.

In passing ERISA, Congress found "that the continued well-being and security of millions of employees and their dependents are directly affected by these plans" and "that they are affected with a national public interest." 29 U.S.C. § 1001(a). As noted above, the Funds have shown that their financial stability is in peril. Further, Mackroyce has submitted [*30] little for this Court to consider in its balance of hardships analysis beyond a statement in a 9/23/1998 letter from its lawyer noting that an injunction "might be financially devastating and could precipitate defendants' demise." (See 9/23/1998 letter to Court from Randy Braun). Even considering the evidence of Mackroyce's financial instabilities which the Funds have submitted, the public interest in maintaining

2000 U.S. Dist. LEXIS 3548, *; 25 Employee Benefits Cas. (BNA) 1344

employee benefit plans pushes the balance of hardships decidedly upon the Funds.

Therefore, Mackroyce is directed to pay the disputed amount, $ 143,754.70, into the registry of the court.

**CONCLUSION**

THUS,

(1) Summary judgment is granted to the Funds in the amount of $ 149,058.56. In addition, the Funds are to be paid interest and statutory damages as to this amount, as well as the attorneys' and auditors' fees involved with bringing this action. The Funds shall submit to the Court its briefing on these amounts within fifteen days of this Order. Any Mackroyce opposition is due within thirty days of this Order.

(2) Summary judgment is denied as to the amount of $ 142,198.72, there existing material questions of fact as to whether the Funds' audit improperly [*31] included

hours worked in trade classifications outside the ambit of the CBA.

(3) The Funds' request for a preliminary injunction as to the amount remaining in dispute, $ 142,198.72, is granted. This amount is to be paid into the registry of the Court, interest-bearing account, not later than fifteen days from the date of this Order.

(4) The complaint in this action seeks the recovery of Mackroyce delinquencies arising under the CBA covering the period from February 15, 1993 through June 30, 1997. If the Funds wish to pursue later delinquencies, they must initiate a separate action.

SO ORDERED.

DATED: March 17, 2000

New York, New York

LAWRENCE M. McKENNA

U.S.D.J.

LEXSEE 12 EBC 1864



Cited
As of: Jan 17, 2007

**LABORERS' INTERNATIONAL UNION OF AMERICA NATIONAL
(INDUSTRIAL) PENSION FUND, et al., Plaintiffs, v. PACIFIC ASCORP, Defendant**

Civil Action No. 90-613

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**1990 U.S. Dist. LEXIS 19030; 12 Employee Benefits Cas. (BNA) 1864**

**May 30, 1990, Filed**
**May 30, 1990, Filed**

**JUDGES:** [*1]

Thomas Penfield Jackson, United States District Judge.

**OPINION BY:**

JACKSON

**OPINION:**

MEMORANDUM AND ORDER

This case is a collection action under § 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1145, by two separate Funds against an employer. One fund, n1 the Laborers' National Health and Welfare Fund ("Health and Welfare Fund"), seeks a preliminary injunction requiring the employer, Pacific Ascorp ("Ascorp"), to submit forthwith delinquent contributions and contribution reports to the Health and Welfare Fund. If the injunction is not granted, plaintiffs contend, the Health and Welfare Fund will suffer serious financial harm and be compelled to expel Ascorp from participation in the Fund and/or to withhold eligibility or benefits for Ascorp's employees and their dependents.

---

n1 The Health and Welfare Fund and its administrator, Henry J. Moreschi, are the parties seeking the preliminary injunction. The Pension Fund has not joined in the application.

Plaintiff Laborers' International Union [*2] of North America National (Industrial) Pension Fund ("Pension Fund") is an employee pension benefit plan within the meaning of § § 3(2) and (3) and § 502(d)(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § § 1002(2) and (3) and § 1132(d)(1). The Pension Fund is also a multiemployer plan within the meaning of § § 337 and 515 of ERISA, 29 U.S.C. § 1002(37) and § 1145.

Plaintiff Laborers' National Health and Welfare Fund ("Health and Welfare Fund") is an employee welfare benefit plan and an employee benefit plan with the meaning of § § 3(1) and (3) and § 502(d)(1) of ERISA, 29 U.S.C. § 1102(1) and (3) and § 1132(d)(1), and a multiemployer plan within the meaning of § § 3(37) and 515 of ERISA, 29 U.S.C. § § 1002(37) and § 1145. Both funds are authorized to maintain suit as independent legal entities under § 502(d)(1) of ERISA, 29 U.S.C. § 1132(d)(1). The Health and Welfare Fund provides health and welfare benefits to eligible employees on whose behalf employers contribute union dues pursuant to collective bargaining agreements with the Laborers' International Union of North America, AFL-CIO ("LIUNA"), its affiliated local unions, and district councils.

1990 U.S. Dist. LEXIS 19030, *; 12 Employee Benefits Cas. (BNA) 1864

Plaintiff Henry J. [*3] Moreschi is the Administrator for both the Pension Fund and the Health and Welfare Fund and is a fiduciary of both Funds with the meaning of § § 3(21) and 502 of ERISA, 29 U.S.C. 1002(21) and § 1132.

Defendant Pacific Ascorp ("Ascorp") is an asbestos removal company and an employer carrying on business in California, operating as a for-profit business within the meaning of § § 3(5) and 515 of ERISA, 29 U.S.C. § 1002(5) and § 1145.

Jurisdiction is predicated on § § 502(e)(1)(f) of ERISA, 29 U.S.C. § § 1132(e)(1)(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1337.

## I

Defendant Ascorp executed a collective bargaining agreement on July 1, 1989 with the Southern California District Council of Laborers, requiring Ascorp to make contributions to the Health and Welfare Fund on behalf of its employees for health and welfare benefits. Defendant also executed and entered into a Participation Agreement with the District Council and the Health and Welfare Fund, which describes more fully defendant's obligations to the Health and Welfare Fund. In addition, defendant agreed to be bound by the Health and Welfare Fund's Trust Agreement which reiterates defendant's obligations to make contributions and to submit [*4] contribution reports to the Fund, and to fulfill other obligations in the event of delinquency.

In the application for a preliminary injunction currently before the Court, plaintiffs allege that Ascorp violated the collective bargaining agreement, the Health and Welfare Fund Participation Agreement, and the Health and Welfare Fund Trust Agreement by failing to submit required contributions and contribution reports on a monthly basis to the Health and Welfare Fund. Plaintiffs estimate that defendant owes at least $ 56,730.12 in delinquent contributions and interest to the Health and Welfare Fund, for the months of August 1989 through January 1990, although the magnitude of delinquent contributions cannot be ascertained because of defendant's failure to submit required contribution reports.

The Health and Welfare Fund alleges it has paid premiums to its insurer, Union Labor Life Insurance Co. ("ULLICO"), in the amount of $ 46,235.36, for coverage of Ascorp's employees and their dependents for the six month time period corresponding to defendant's delinquency. n2 The Health and Welfare Fund assets that it depends on receipt of the contributions from defendant in order to meet its premium [*5] obligations, and that it relied on receiving them in undertaking the financial commitment to pay premiums to ULLICO. According to the Health and Welfare Fund, the failure of defendant to submit the required contributions has caused the Fund "to use up reserves, to forego investment income, and to otherwise suffer financial distress." The Fund's administrator, Mr. Moreschi, avers that this loss of revenue has jeopardized the actuarial soundness of the fund.

n2 In its reply, plaintiffs assert that additional contributions are now overdue, reflecting defendant's delinquency for the months of February 1990 through the present.

The Health and Welfare Fund is now in a position where it can no longer afford to continue providing benefit coverage to ULLICO for Ascorp's employees and their dependents. Mr. Moreschi claims that the depletion of the Fund's accumulated reserves has precluded the Fund from considering an increase in benefits for participants and may create the need for an increase in premiums. Additionally, the depletion [*6] has rendered it difficult for the Fund to be prepared to meet emergency needs. If the injunction is not granted, plaintiffs assert, the Fund will be forced to expel Ascorp from participation in the Fund, pursuant to the terms of the Trust Agreement, and thereby terminate the benefits to Ascorp's employees. These benefits include but are not limited to medical, life, "AD&D," and dental insurance.

Defendant does not dispute its failure to make the required contributions, to pay interest thereon, and to submit contribution reports. It argues, however, that the company is experiencing extreme financial difficulties. Ascorp states that if the injunction were granted, the company would, at best, be unable to continue providing safe working conditions for its employees and, at worst, become insolvent. Defendant also contends that if the injunction were denied, any serious harm that might occur would befall Ascorp's employees, not plaintiffs, thus rendering plaintiffs' claim of irreparable injury without merit.

## II

It is well settled that a preliminary injunction will issue where the following four factors are established: the movant is substantially likely to succeed on the merits; the movant [*7] will suffer irreparable harm absent injunctive relief; the relief sought will not harm the non-moving party to a greater extent than that which the moving party will suffer absent an injunction; and the public interest is be best served by an issuance of an injunction. Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977); Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958). For

Page 3

1990 U.S. Dist. LEXIS 19030, *; 12 Employee Benefits Cas. (BNA) 1864

the reasons stated below, the Court will grant plaintiffs' motion for a preliminary injunction.

### Likelihood of Success on the Merits

Section 515 of ERISA, 29 U.S.C. § 1145, states:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

The three agreements giving rise to this action created a legally binding obligation on defendant, which, defendant concedes, requires defendant to make contributions and to submit contribution [*8] reports to the Health and Welfare Fund. Plaintiffs have made a sufficient showing that defendant failed to make the required contributions and to submit the corresponding contribution reports, and defendant does not dispute the allegation that it has failed to abide by the terms of the three agreements. Defendant complains, however, about union misconduct, which defendant believes amounts to a defense for its failure to comply with the terms of the collective bargaining agreement. Defendant also asserts that the Health and Welfare Fund was not a party to the collective bargaining agreement and therefore lacks standing to bring this suit. Finally, defendant contends that it has equally, and perhaps more, compelling legal obligations which it must fulfill in order to preserve its financial health.

The terms of the several agreements and case law from this and other jurisdictions support both plaintiffs' capacity to bring this suit and the substantial likelihood that they will succeed on the merits. It is established that pension and welfare trusts constitute third-party beneficiaries of collective bargaining agreements. See Bituminous Coal Operators' Ass'n, Inc. v. Connors, 867 F.2d 625, 632-33 (D.C. Cir. 1989); [*9] Robbins v. Lynch, 836 F.2d 330, 333 (7th Cir. 1988); Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir. 1986), cert. denied, 479 U.S. 1065 (1987). Moreover, the Participation Agreement and the Trust Agreement, signed by the Health and Welfare Fund and defendant, clearly contemplate the Health and Welfare Fund as a third-party beneficiary of the collective bargaining agreement. In addition, these same cases have involved similar suits by welfare and pension plans seeking to recover contributions from employers, and the plaintiffs in those cases were not found to have lacked capacity to bring such suits.

Courts have also distinguished third-party beneficiaries arising in this context from the "typical" third-party beneficiary in which the beneficiary steps into the shoes of the promisee and is subject to any claim or defense that the promisor asserts against the promisee. As the court of appeals observed in Bituminous Coal, 867 F.2d at 632-33, pension funds are immune from any offsetting claims by the employer against the union. See, Lewis v. Benedict Coal Corp., 361 U.S. 459, 468-69 (1960). [*10] Bituminous Coal also makes clear that § 515 of ERISA, 29 U.S.C. § 1145, not only applies to delinquent contributions, but also "entitles pension funds to rely upon, and to enforce, the written terms of collective bargaining agreements insofar as they relate to pension contributions, whether delinquent or anticipated." See also Robbins, 836 F.2d at 333 ("Funds must assume that all participants in a plan are following the stated terms[.]"). Adopting the reasoning of the Seventh Circuit in Robbins, and the Ninth Circuit in Southern California Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262 (9th Cir. 1984) (cautioning that the range of contract defenses to trustees' collection action should be "severely limited"), this circuit stated:

When the trustees of a pension plan created pursuant to a collective bargaining agreement sue an employer for contributions required by the plan, the employer may not defend on the ground of union misconduct in negotiating the agreement. If it means nothing else, section 515 means that, at least when the Trustees are not implicated in the alleged misconduct, their [*11] suit cannot be thwarted by defenses not apparent from the face of the Agreement.

Bituminous Coal, 867 F.2d at 634. Therefore, whatever defenses Ascorp may wish to raise against the union, were it a party to this suit, those defenses simply cannot be used against plaintiffs in the instant action. The Court finds that plaintiffs are substantially likely to succeed on the merits.

### Irreparable Harm

Plaintiffs contend they will suffer irreparable harm if the injunction is denied because defendant's failure to make the required contributions has jeopardized the fund's financial stability. In support of this argument, plaintiffs rely on several cases in which it has been held that failure to make required contributions to multiemployer plans may constitute irreparable harm.

In Gould v. Lambert Excavating Inc., 870 F.2d 1214, 1217 (7th Cir. 1989), the Seventh Circuit observed that when a fund makes payments without receiving corresponding contributions, the fund's financial security may be endangered. The court also noted that in light of the express purpose of ERISA to protect employees covered by benefit plans, "The probability of irreparable [*12] harm [to the fund] is strong, although the facts of

Case 1:06-cv-02177-RJL    Document 6    Filed 02/12/2007    Page 22 of 30

Page 4

1990 U.S. Dist. LEXIS 19030, *; 12 Employee Benefits Cas. (BNA) 1864

each case may differ, and an injunction must be issued on a case-by-case basis." Id. at 1221.

In Van Drivers Union Local No. 392 v. Neal Moving & Storage, 551 F. Supp. 429 (N.D. Ohio 1982), a district court found that the threat of a loss of investment opportunities by a health care trust fund constituted irreparable injury warranting the issuance of a preliminary injunction to enjoin the defendant employer from violating the terms of a collective bargaining agreement and to require the defendant to make contributions due to the fund.

Defendant argues that money damages would suffice to compensate plaintiffs for any economic loss for which they ultimately prove defendant liable and that plaintiffs therefore have not met the burden of showing they will suffer immediate, irreparable harm. Defendant offers no authority, however, for the proposition that multiemployer funds are barred from seeking injunctive relief in these circumstances.

Moreover, plaintiffs also assert that, because defendant's own financial health is precarious, the possibility that defendant might be unable to satisfy a judgment [*13] rendered at a later point in time creates a further threat of irreparable harm. Again, several courts have found irreparable harm threatened, in part, by a defendant employer's bleak financial condition. See, e.g., Mamula v. Satralloy, Inc., 578 F. Supp. 563, 576-79 (S.D. Ohio 1983); Central States, Southeast & Southwest Areas Pension Fund v. Admiral Merchants, Motor Freight, Inc. 511 F. Supp. 38, 43 (D. Minn. 1980); aff'd sub nom., Central States, Southeast & Southwest Areas Pension Fund v. Jack Cole-Dixie Highway Co., 642 F.2d 1122 (8th Cir. 1981).

Finally, plaintiffs contend that if the injunction is not granted, defendant's employees will face imminent, irreparable harm because plaintiffs will no longer be able to provide medical and other similar benefits to them. Defendant concedes that termination of these benefits to its employees would be harmful, but argues that such harm, even if irreparable, cannot be imputed to plaintiffs. Only its employees, it says, are entitled to assert such a claim of irreparable harm. n3

n3 Defendant also alleges that worker's compensation is available to its employees, thereby lessening any harm they would sustain if plaintiffs terminate the benefits coverage.

[*14]

The Supreme Court and numerous district courts have found multiemployer funds to be the appropriate representatives of the participants and beneficiaries of

collective bargaining agreements. In NLRB v. Amax Coal Co., 453 U.S. 322 (1981), the Supreme Court observed that in enacting ERISA, Congress intended the trustee of an employee benefit fund to "discharge his duties . . . solely in the interest of the participants and beneficiaries . . ." Id. at 332 (citation to statute omitted). The Court held that "indeed, the trustees have an obligation to enforce the terms of the collective-bargaining agreement regarding employee fund contributions against the employer 'for the sole benefit of the beneficiaries of the fund.'" Id. at 337 (citing United States v. Carter, 353 U.S. 210, 220 (1957)).

There can be no question that the employees of the defendant in the case at bar are "participants" and "beneficiaries" of the collective bargaining agreement signed by defendant. It is also clear from the case law and from ERISA, 29 U.S.C. § 1132(a)(3), that an employee benefit fund and its fiduciary are the appropriate [*15] entities to bring suit and are properly situated to assert irreparable harm on behalf of defendant's employees. With respect to the harm defendant's employees will suffer if the benefits are cut off, numerous courts have held that monetary damages would not adequately compensate the employees for the losses they would sustain. Most of defendant's employees probably cannot afford to buy individual health insurance coverage and, therefore, will be left without resources to cover their medical expenses and emergencies. The Court finds, therefore, that absent injunctive relief, the Health and Welfare Fund and Ascorp's employees will suffer irreparable harm.

Harm to Defendant

Defendant contends that if forced to make the required contributions to plaintiffs, defendant will not be able to continue to provide safe working conditions for its employees, as required by law. The harm that would befall its employees from poor working conditions, defendant urges, is much greater than that which would occur if its employees' health coverage were terminated. Again, defendant does not support this proposition with any definitive evidence or direct legal authority; defendant also fails to recognize [*16] that fulfillment of one legal obligation does not excuse the nonperformance of another.

Courts have held that an employer's precarious financial condition, and even imminent insolvency, cannot be used by the employer to evade its responsibilities. As the court stated in Central States, Southeast & Southwest Areas Pension and Health & Welfare Funds v. McNamara Motor Express, Inc., 503 F. Supp. 96, 99 (W.D. Mich. 1980), "it is not the court's role to protect defendant from creditors 'nipping at its heels.'" Other courts, as well, have granted preliminary injunctive relief despite the financial burden such relief imposed on the defendant

employer. See, e.g., Mamula v. Satralloy, Inc., 578 F. Supp. 563, 578-79 (S.D. Ohio 1983); Van Drivers Union Local No. 392 v. Neal Moving & Storage, 551 F. Supp. 429, 433 (N.D. Ohio 1982).

In the instant case, defendant may not evade its responsibilities on the ground that it cannot otherwise fulfill its other obligations. Defendant's concern reduces to a question of its own financial viability, but its fear of being rendered unable to afford adequate working conditions for its employees [*17] is simply not a viable defense to plaintiffs' charges. The Court finds that the threatened injury to the Health and Welfare Fund and Ascorp's employees outweighs any harm a preliminary injunction might cause defendant.

Public Interest

Congress has clearly expressed its view in ERISA "that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest. . . ." 29 U.S.C. § 1001(a). Furthermore, at least two district courts have found that the "stability and protectio [of such plans] require assurance of adequate funding and the prevention of arbitrary termination of rights." Van Drivers, 551 F. Supp. at 432 (quoting Central States, Southeast and Southwest Areas Pension and Health & Welfare Funds v. McNamara Motor Express, Inc., 503 F. Supp. 96 (W.D. Mich. 1980). Finally, the court in Van Drivers reiterated the established judicial view that § 502(a)(3) of ERISA is "unambiguous evidence of Con-

gress' express intent to permit federal courts to issue injunctions." Id. at 432 (quoting Laborers Fringe Benefits Funds -- Detroit & Vicinity v. Northwest Concrete & Constr., 640 F.2d 1350, 1352 (6th Cir. 1981)); [*18] cf. Fechter v. HMW Indus., Inc., 879 F.2d 1111, 1120 (3rd Cir. 1989) (affirming district court's grant of preliminary injunction and stating that "Congress . . . intended that courts exercise discretion and flexibility in ensuring compliance with ERISA."). For essentially the same reasons, this Court finds that it is in the public interest to grant plaintiffs' motion for a preliminary injunction.

WHEREFORE, for the foregoing reasons, it is, this 30th day of May, 1990,

ORDERED, that plaintiffs' motion for a preliminary injunction is granted; and it is

FURTHER ORDERED, that defendant submit all past due contribution reports and contributions to the Health and Welfare Fund on or before June 30, 1990; and it is

FURTHER ORDERED, that defendant submit contribution reports and pay contributions to the Health and Welfare Fund by the 20th day of the month following the month during which contributions accrued on behalf of all bargaining unit employees; and it is

FURTHER ORDERED, that plaintiffs post an injunction bond of Five Hundred Dollars ($ 500) within ten (10) days of this Order.

00022

LEXSEE 1989 U.S. DIST. LEXIS 7573



Cited
As of: Jan 17, 2007

JAMES McCRORY, Administrator of LOCAL UNION NO. 501
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS WELFARE
FUND, JAMES McCRORY, Administrator of LOCAL UNION NO. 501
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS PENSION
FUND, JULIE CAMARDELLA Administrator of LOCAL UNION NO. 501
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
SECURITY BENEFIT FUND, MARTIN FARERI, Administrator of LOCAL
UNION NO. 501 INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS APPRENTICESHIP AND TRAINING TRUST FUND, and JOHN M.
GRAU and JACK F. MOORE, as TRUSTEES OF NATIONAL ELECTRICAL
BENEFIT FUND OF THE NATIONAL EMPLOYEES BENEFIT BOARD FOR
THE ELECTRICAL CONTRACTING INDUSTRY, Plaintiffs, v. G.C. MONACO
ELECTRIC, INC. and "JOHN DOE" individually and as an officer and shareholder
of G.C. MONACO ELECTRIC, INC., Defendants

No. 88 Civ. 1387 (CSH)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1989 U.S. Dist. LEXIS 7573

July 5, 1989, Decided

**OPINION BY:** [*1]

HAIGHT, JR.

**OPINION:**

MEMORANDUM OPINION AND ORDER

CHARLES S. HAIGHT, JR. UNITED STATES
DISTRICT JUDGE

This action for breach of contract and violation of
the Employee Retirement Income Security Act of 1974,
29 U.S.C. § § 1001 et seq., ("ERISA") is now before the
court on plaintiffs' motion for summary judgment pursu-
ant to Fed. R. Civ. P. 56, and for injunctive relief as au-
thorized by section 502(a)(3) of ERISA, § 1132(a)(3).
Plaintiffs further move to dismiss defendants' counter-
claim pursuant to Rules 12(b)(1), 12(b)(6) and 12(c).

BACKGROUND

The relevant facts are not in dispute.

This action is brought by and on behalf of the Ad-
ministrators and Trustees of the jointly administered em-
ployee labor-management Taft-Hartley trust funds (the
"Funds") of Local Union No. 501, International Brother-
hood of Electrical Workers ("Local 501"). The Funds
were established and are maintained pursuant to a collec-
tive bargaining agreement in accordance with Section
302 (c)(5) of the Taft-Hartley Act, 29 U.S.C. §
186(c)(5). n1 This suit is authorized by section 502(a)(3)
of ERISA, as amended, 29 U.S.C. § 1132(a)(3). Plain-
tiffs are fiduciaries within the meaning of sections 3(21)
and 502 of ERISA, 29 [*2] U.S.C. § § 1002(21) and
1132, and bring this action in that capacity.

n1 The purpose of the Funds is to "protect . .
. the interests of participants in employee benefit
plans and their beneficiaries . . . by establishing

1989 U.S. Dist. LEXIS 7573, *

standards of conduct, responsibility and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).

Defendant, G.C. Monaco Electric, Inc. ("Monaco"), is a New York Corporation which employs members of Local 501. The "John Doe" defendant is sued individually and in his capacity as an officer and shareholder of Monaco.

On May 31, 1986, the Westchester-Fairfield Chapter of the National Electrical Contractors Association, Inc. ("NECA") n2 and Local 501 entered into a new collective bargaining agreement. n3 As is customary in the industry, defendant Monaco signed a letter of assent, which acknowledged that it was bound by the agreement. The agreement requires signatory employers to make certain contributions to the plaintiff Funds. n4 The amount of the contributions is calculated on the basis of weekly shop reports that the employer is required to deliver. n5 [*3]

n2 Although the point is not made entirely clear in the parties' papers, it appears that NECA is an association of electrical employers with which defendant Monaco is affiliated.

n3 For the past twenty years, defendant Monaco has been signatory to this type of agreement which is negotiated by NECA. The contract is renewed every three years. The preface to the terms of the collective bargaining agreement provides as follows:

Agreement by and between the Westchester-Fairfield Chapter - N.E.C.A. and Local Union No. 501, IBEW. It shall apply to all firms who sign a Letter of Assent to be bound by the terms of this Agreement. As used hereinafter in this Agreement, the term "Employer" shall mean the Westchester-Fairfield Chapter - N.E.C.A. and the term "Union" shall mean Local Union No. 501, IBEW. The term "Employer" shall mean an individual who has been recognized by an assent to this Agreement.

Collective Bargaining Agreement attached as Exhibit A to Affidavit of James McCrory at 1 (emphasis in the original) ("Agreement").

n4 Article IV of the agreement states that "[t]he payment shall be made . . . on the last day

of each calendar month, . . . [t]he payment and the payroll report shall be mailed to reach the office not later than fifteen (15) calendar days following the end of each calendar month." Agreement at 13.

[*4]

n5 Article IV Section 7(b) states that these Shop Reports "are to be written weekly." Agreement at 17.

When this action was filed on March 1, 1988, Monaco was delinquent in respect of both the required payments and the submission of shop reports. n6 Since the suit's commencement, Monaco has made some of the overdue contributions, but has furnished none of the overdue shop reports. n7

n6 As of March 1, 1988, contributions and shop reports had not been received since December 25, 1987. It also appears that plaintiffs' counsel had written the defendant regularly starting in December 1986 in an attempt to collect contributions without legal action.

n7 As of June 1988, payments and shop reports were still due from April 1, 1988.

The instant action was commenced pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132 n8 to recover monetary contributions required by Section 515 of ERISA, 29 U.S.C. § 1145 n9 and Section 301 of the Taft Hartley Act, 29 U.S.C. § 185, which requires employers to pay fringe benefit contributions in accordance with the terms and conditions of the collective bargaining agreement. Plaintiffs also pray for permanent injunctive relief requiring prompt [*5] payments.

n8 § 1132(a)(3) states that "[a] civil action may be brought by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or terms of the plan."

n9 § 1145 states that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law,

00024

1989 U.S. Dist. LEXIS 7573, *

make such contributions in accordance with the terms and conditions of such plan or such agreement."

Defendants admit that the mandatory payments are overdue, but contend that as of the time the suit was filed they were only overdue by two days. They further concede that if one is in violation of Section 515 of ERISA, liability would extend to any outstanding payments in addition to double interest on such arrears and reasonable attorneys' fees. Defendants, however, counterclaim asserting that the proper standard for evaluating the timeliness of the required contributions [*6] provides for a longer period than do the terms of the agreement. Monaco states that "it is common knowledge that within the industry that [sic] the ongoing practice of the Funds is that payments and reports are on average made 6 weeks, more or less, after the date that an employee performs work." Affidavit of Giulio C. Monaco sworn to on July 27, 1988 at para. 8. Defendants contend that the plaintiff Funds are pursuing a policy of discriminatory enforcement insofar as certain other employers are more delinquent in their contributions. Specifically, Monaco contends it has been singled out as a result of its labor disputes with Local 501.

Defendants do not raise their counterclaim under ERISA, but rather as a compulsory counterclaim pursuant to Rule 13(a). n10 Defendants argue that the counterclaim is compulsory because it arises from the same factual basis as does plaintiffs' cause of action.

n10 Rule 13(a) provides that a counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."

Defendants [*7] seek an order of injunction preventing plaintiffs from continuing to treat them in a discriminatory manner in respect of required contributions to the Funds. In addition, defendants ask for damages in the amount of $ 10,000.

There is a history of litigation in this district between the plaintiff Funds and the defendants. On December 11, 1984, a lawsuit was commenced against Monaco for unpaid contributions dating back to August 10, 1984. 84 Civ. 8526 (RO). In that case Judge Owen, after a hearing, granted plaintiffs' motion for summary judgment and injunctive relief. Sarver v. G.C. Monaco Elec., Inc., No. 84 Civ. 8526 (S.D.N.Y. Oct. 24, 1985).

DISCUSSION

Summary Judgment

Summary judgment is appropriate if the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c).

Therefore, on a motion for summary judgment, the court focuses upon "whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty [*8] Lobby, Inc., 477 U.S. 242, 250 (1986). The question raised by Anderson is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-252. See also Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (Rule 56 is intended to implement the rights of litigants to demonstrate prior to trial that claims "have no factual basis"). Although the party opposing summary judgment is to be given the benefit of all reasonable doubt in deciding whether a genuine issue of material fact exists, mere conjecture or speculation does not provide a basis upon which to deny the motion; and the adverse party must do more than simply show that there is some metaphysical doubt as to the material facts. Arc Inc. v. Eastman Kodak Co., 801 F.2d 38, 41-42 (2d Cir. 1986) (citing Matushita Electric Industrial Co. v. Zenith Radio Corp., [475 U.S. 574] (1986)).

Defendants do not dispute that they are bound by the collective-bargaining agreement, nor that they are behind in their contributions and shop reports. Furthermore, there is no argument that such material is not due on [*9] a timely basis. However, defendants contend that summary judgment should not enter because there is a triable issue of material fact regarding what constitutes timeliness. Monaco argues that common practice, not the written agreement, is the proper standard of review. As discussed supra, defendants assert that payments do not become due until approximately six weeks after the end of the work week, and that a further 14 day grace period is also common practice.

Even if I accept defendants' argument as to the appropriate standard of timeliness, the required payments were still overdue as of the suit's commencement. Similarly, since the start of this litigation, Monaco has made some of the required contributions but has not brought payments and submissions of shop reports fully up to date. n11 The funds have a right to seek collection of such overdue payments pursuant to Section 501(a)(3) of ERISA, as amended, 29 U.S.C. § 1132(a)(3). Defendants' argument concerning discriminatory enforcement is not to the contrary. n12

n11 Under defendants' standard of timeliness, employers have eight weeks to make the required contributions. As of March 1, 1988, the date on which this action was filed, Monaco had not made any contributions since December 25, 1987. Even under the eight week "common practice" standard advanced by the defendants, the payments should have been made in late February.

[*10]

n12 I express no view as to the merits of defendants' counterclaim, for the reasons stated infra, but I note that this is not the first time defendants have been remiss in their duty of prompt payment. In the prior suit there appears to have been no mention of the alleged discriminatory treatment raised in the nature of an excuse here. I further note that defendants cite no case law in support of the argument that discriminatory enforcement is contrary to the statutory intent underlying ERISA.

Injunctive Relief

To obtain injunctive relief, plaintiffs must demonstrate that they would suffer irreparable injury absent the entry of such an order. D.C. Paving Indus. Trust v. Jones & Artis Co., 2 E.B.C. 2227 (D.C. 1981). See also Van Drivers Union Local No. 392 v. Neal Moving and Storage, 551 F. Supp. 429, 431 (N.D. Ohio 1982) (on motion for preliminary injunction, party seeking relief must demonstrate that it has a substantial likelihood of prevailing on the merits; that it will suffer irreparable injury if the relief is not granted; that there will be no substantial harm to others if the relief is granted; and that the public interest will be served by the issuance [*11] of the injunction). Id. (citation omitted).

Here the plaintiff Funds demonstrate irreparable harm in that absent injunctive relief, the Funds would be unable to ensure prompt, regular payment, and other employers would not be deterred from following defendants' lead. It is right in this situation to allow the Funds to use one particularly delinquent employer as an example. If others are also late, the need for court intervention is that much greater, but the Funds should not be compelled to bring coat action against each employer who is in arrears. Rather, obtaining judgment against one employer serves as a warning to all. Furthermore, this employer's apparent recidivism argues for injunctive relief against it. "On the track record of this defendant, the injunction is

warranted." Sarver, supra, slip op. at 1. (citation omitted).

Similarly, public policy interests will be furthered by compelling compliance. ERISA was enacted in part "to provide a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans." Section 302(a)(4) of ERISA, 29 U.S.C. § 1001a(c)(4). This purpose cannot be furthered in the case at bar absent entry of an order [*12] directing Monaco's compliance with the contribution provisions of the agreement.

Defendants' Counterclaim

Defendants' counterclaim is permissive under Rule 13(b), n13 not compulsory under Rule 13(a). The court has established four criteria for determining whether counterclaims are compulsory: "1) Are the issues of fact and law raised by the claim and the counterclaim largely the same; 2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?; 3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim; 4) Is there any logical relation between the claim and the counterclaim?" McCaffrey v. Rex Motor Transp., Inc., 672 F.2d 246, 248 (1st Cir. 1982) (citations omitted). These criteria are clearly not met in the case at bar.

n13 Rule 13(b) provides that "[a] pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim."

Defendants contend that plaintiffs' instigation of the instant suit is tortious because plaintiffs "are applying a different standard to the [*13] defendant than other contractors." Defendants' brief at 4. That is to say, defendants' counterclaim arises solely out of the prosecution of this action. Such a counterclaim, requiring consideration of a labor dispute unrelated to ERISA and standards applied by plaintiffs to a host of other employers, can hardly be said to present issues of fact and law "largely the same" as those of the complaint. Indeed, it is generally held that counterclaims focusing upon allegedly wrongful litigation are permissive, not compulsory. E.g., Comidas Exquisitos, Inc. v. Carlos McGee's Mexican Cafe, Inc., 602 F. Supp. 191, 200 (S.D. Iowa 1985), aff'd, 775 F.2d 260 (8th Cir. 1985). The other three criteria are equally unavailing to this defendant.

This Court's ancillary jurisdiction does not extend to permissive counterclaims. Rather, "there [must] exist[] some independent jurisdictional bas[is] such as the exis-

1989 U.S. Dist. LEXIS 7573, *

tence of a federal question" for jurisdiction to exist as to the counterclaim. Federman v. Empire Fire and Marine Ins. Co., 597 F.2d 798, 812 (2d Cir. 1979). Defendants posit no such independent jurisdictional basis, and indeed none exists. Therefore, defendants' counterclaim must [*14] be dismissed.

CONCLUSION

Plaintiffs' motion for summary judgment and for injunctive relief is granted. Plaintiffs are directed to settle an order on five (5) days' notice within fourteen (14) days of the date of this Opinion.

Defendants' counterclaim is dismissed without prejudice.

The foregoing is SO ORDERED.

Dated: New York, New York, July 5, 1989

LEXSEE REV. RUL. 85-130


Cited
As of: Jan 17, 2007

Revenue Ruling 85-130

Rev. Rul. 85-130; 1985-2 C.B. 137; 1985 IRB LEXIS 158; 1985-34 I.R.B. 11

July 1985

[*1]

**SUBJECT MATTER:** Section 411.-Minimum Vesting Standards

**APPLICABLE SECTIONS:**

26 CFR 1.411 (a)-5: Service included in determination of nonforfeitable percentage. (Also Sections 401, 410: 1:401-1, 1.410(a)-1.)

**TEXT:**

**Qualification; vesting; credit for all years of service.** A multiple employer defined benefit plan must credit employees for all years of service whether or not an employer makes the required contributions to the plan. A plan that does not credit all years of service does not provide definitely determinable benefits as required by section 1.401-1 (b) (1) (i) of the regulations and does not satisfy the minimum participation and vesting standards of sections 410 and 411 of the Code.

ISSUES

(1) Whether a plan that credits service as described below provides definitely determinable benefits as required by section 1.401-1 (b) (1) (i) of the Income Tax Regulations.

(2) Whether the plan satisfies the requirements of sections 410 and 411 of the Internal Revenue Code.

FACTS

A multiple employer defined benefit plan provides that any service attributable to periods for which an employer did not make required contributions to the plan shall not be credited to the employer's employees for purposes of determining eligibility to participate,  [*2]  vesting, or benefit accruals.

LAW AND ANALYSIS

Section 1.401-1 (b) (1) (i) of the regulations defines a qualified pension plan as a plan established and maintained by an employer to provide definitely determinable benefits to its employees.

Rev. Rul. 74-385, 1974-2 C.B. 130, provides that in the case of a defined benefit pension plan, benefits will be considered definitely determinable if the plan contains an express formula under which each participant's benefit can be computed and such formula is not subject to employer discretion.

Although the plan in this case contains a formula for determining participants' benefits, benefits are actually determined under that formula only to the extent that the employer, in its discretion, makes required contributions.

Page 2

Rev. Rul. 85-130; 1985-2 C.B. 137;
1985 IRB LEXIS 158, *; 1985-34 I.R.B. 11

Sections 410 and 411 of the Code establish minimum participation, vesting, and benefit accrual standards. Under these sections, an employee's eligibility to participate, vesting, and benefit accruals are based on years of service.

Section 1.410(a)-1 (b) (5) of the regulations (relating to minimum participation standards) provides that rules relating to years of service and breaks in service are found in Part 2530 of the Department of  [*3]  Labor Regulations (relating to minimum standards).

Section 1.411(a)-6 of the regulations (relating to vesting) and section 1.411 (b)-1 (f) (relating to benefit accruals) also refer to Part 2530 of the Department of Labor Regulations for the purpose of computing service for vesting and benefit accrual.

Section 2530.210 (c) of the Department of Labor Regulations provides rules for determining years of service in a multiple employer plan. Section 2530.210 (c) (3) (i) defines multiple employer plan to include a multi-employer plan as defined in section 414 (f) of the Internal Revenue Code. Section 2530.210 (c) (1) provides that, generally, for purposes of determining eligibility to participate and vesting, all service with the employer or employers maintaining the plan shall be taken into account. Section 2530.210 (c) (2) provides that, generally, for benefit accrual purposes, all covered service with the employer or employers maintaining the plan shall be taken into account.

The minimum participation, vesting, and benefit accrual standards of sections 410 and 411 of the Code were generally designed to protect the employee-participants' pension benefits after many years of service with an  [*4]  employer. The years of service provisions of section 2530.210 (c) (1) and (2) therefore require that the plan provide credit for all covered service with the employer or employers maintaining the plan. An employer that is required by the plan document or collective bargaining agreement to contribute to the plan is an employer maintaining the plan for purposes of determining an employee's years of service whether or not the required contributions are made. To conclude otherwise would enable the employer to effectively circumvent the minimum participation, vesting, and benefit accrual standard by merely failing to make a required plan contribution.

In this case, the plan does not credit service for years in which the employer fails to make the required contributions.

HOLDINGS

(1) This plan does not provide definitely determinable benefits as required by section 1.401-1 (b) (1) (i) of the regulations.

(2) The crediting of service under this plan does not satisfy the requirements of sections 410 and 411 of the Code.

00029