IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL FANNING,

        Plaintiff,

    v.

HIGH MOUNTAIN INSPECTION SERVICES,
INC.,

        Defendant.

Civil Action No. 06cv02177 (RJL)

**DEFENDANT HIGH MOUNTAIN INSPECTION SERVICES, INC.'S OPPOSITION TO PLAINTIFF MICHAEL FANNING'S MOTION FOR A PRELIMINARY INJUNCTION**

Defendant, High Mountain Inspection Services, Inc. ("HMIS" or "the Company"), by and through its attorneys, and pursuant to Rules 7 and 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65.1, respectfully submits this opposition to Plaintiff Michael Fanning's motion for a preliminary injunction.

Plaintiff's Motion should be denied because he cannot satisfy the high standard for irreparable harm. Assuming the "likelihood of success on the merits" were evident, which HMIS denies, the only injury which Plaintiff asserts is an economic loss. Because an economic loss can be compensated with money damages, there is no "irreparable harm." Even if Plaintiff's alleged irreparable harm could be construed as a non-economic injury, there is no clear and present need for a preliminary injunction. Moreover, the issuance of an injunction would cause substantial harm to HMIS and would not be in the public interest. Accordingly, the Court should not issue preliminary injunctive relief, and deny Plaintiff's request that HMIS be ordered to pay all past due contributions and make future contributions that come due during the pending of this lawsuit.

## I.    FACTUAL BACKGROUND[1]

HMIS is headquartered in Casper, Wyoming.  A trust owns 100% of the Company.
HMIS is a solvent company.  As of December 31, 2006, the Company's gross profit was
$5,629,466.60.  HMIS is meeting its obligations to its creditors.  The Company has no plans to,
and is not in the process of, liquidating or dissipating any of its assets, which are valued at
$2,141,266.33.  There is no real threat of bankruptcy currently.

For almost 20 years, HMIS has provided non-destructive testing services to operators of
pipelines and refineries.  Non-destructive testing involves the evaluation of a pipeline for damage
without damaging the pipeline.  Since 1998, HMIS has employed both unionized and non-
unionized employees.  Employees who are engaged in pipeline nondestructive testing are
covered by a collective bargaining agreement between the International Union of Operating
Engineers ("IUOE"), Local 2B, It's [sic] Successors and/or Assigns and Certain Pipeline Non-
destructive Testing Companies ("the Agreement").  The Agreement covers 15 employees.[2]  The
non-unionized employees perform "call out" work, which generally entails working a week at a
time at a refinery, x-ray jobs, or one-day jobs at a compressor station.

The founder, and now deceased President of HMIS, Bill Fraser, had frequent discussions
with Vergil Belfi, the Business Manager for IUOE Local 2B assigned to the Company, regarding
the Agreement which was in effect from October 1, 2001 through September 30, 2006, including
HMIS's obligation to contribute to the Central Pension Fund of the International Union of
Operating Engineers and Participating Employers ("the Central Pension Fund").  Belfi told him
that the Company was obligated to make contributions for employees working on the pipeline
only.  Based upon this understanding, HMIS at all times made contributions for employees

---

[1] Unless otherwise noted, the facts set forth herein are supported by the Declaration of Suzanne Fraser, attached
hereto as Exhibit 1.

[2] HMIS currently has an additional 34 non-union employees.

working on the pipeline. Only "call out" work, such as x-ray and compressor jobs, was not paid at the collectively bargained rate. Those employees for whom HMIS was making contributions were identified on the monthly Report of Contributions, which the Company submitted to the Central Pension Fund.

On September 19, 2005, the Central Pension Fund commenced an audit of HMIS's payroll records for the period January 2002 through August 2005 by reviewing its records on-site. Any questions from the auditor were directed to the current President, Suzanne Fraser. HMIS received no further communications regarding the audit until the results were sent to the Company on or about November 20, 2006. It was this letter which first informed HMIS that the Central Pension Fund had determined that it underpaid its contributions in the amount of $1,549,855.60. On or about December 19, 2006, HMIS received a letter from counsel for the Fund in which the Central Pension Fund threatened to file suit for the unpaid contributions if arrangements were not made for payment by December 29, 2006. On December 21, 2006, Plaintiff filed suit. Docket No. 1. On February 12, 2007. Plaintiff filed his motion for preliminary injunction. Docket No. 3.

HMIS attempted, to no avail, to discuss the findings of the audit with the Central Pension Fund prior to the lawsuit being filed because it disagreed with some of the assumptions made therein. HMIS believes that the Central Pension Fund has used incorrect contribution rates and hours, as well as included employees who are not performing work covered by the Agreement. In some cases, it appears that the Central Pension Fund wrongfully classified certain employees as performing work covered by the Agreement. Those employees are not members of IUOE, and will never receive pension benefits from the Central Pension Fund.

## II.    LEGAL STANDARD AND ANALYSIS

It is well-settled that to succeed on a motion for a preliminary injunction, the moving party must establish the following four (4) factors: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result to the moving party absent injunctive relief; (3) the relief sought will not harm the non-moving party to a greater extent than that which the moving party will suffer absent an injunction; and (4) that the public interest is best served by an issuance of an injunction. *Laborers' Int'l Union of America Nat'l (Indus.) Pension Fund, et al. v. Pacific Ascorp*, Civil Action No. 90-613, 1990 U.S. Dist. LEXIS 19030, **6-7 (D.D.C. May 30, 1990) (citing *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  A preliminary injunction is an extraordinary remedy that should not  be granted absent a clear and convincing showing by the moving party.  *Association of Flight Attendants-CWA v. Pension Benefit Guaranty Corp.*, 372 F. Supp. 91, 98 (D.D.C. 2005); *see also Pattern Makers' Pension Trust Fund v. The Erler Corp.*, Civil Action No. 92-C-3350, 1992 U.S. Dist. LEXIS 10193, *2 (N.D. Il. July 1, 1992).

If the moving party fails to demonstrate any irreparable injury, the Court need not inquire further before denying the injunction.  *Association of Flight Attendants-CWA*, 372 F.Supp.2d at 98 (citing *Dodd v. Fleming*, 223 F. Supp. 2d 15, 20 (D.D.C. 2002)).  In this Circuit, the standard for irreparable harm is very high.  *Al-Ghizzawi v. Bush*, Civil Action No. 05-2378 (JDB), 2006 U.S. Dist. LEXIS 71252, *17 (D.D.C. Oct. 2, 2006).  Thus, the Court should not grant injunctive relief absent a clear and present need for a preliminary injunction to avoid irreparable harm.  *Id.* (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

**A.    Plaintiff Cannot Show that the Central Pension Fund Will Suffer Irreparable Harm If the Preliminary Injunction is not Issued.**

Assuming *arguendo* that Plaintiff was able to sufficiently demonstrate a likelihood of success on the merits,[3] the Court nevertheless should deny the request for a preliminary injunction since Plaintiff has not shown an irreparable harm.  There is no *per se* "irreparable harm".  Hence, irreparable harm must be determined on a case-by-case basis.  *Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co.*, 660 F. Supp. 1500, 1507 (S.D. Cal. 1987).

The mere fact that an employer fails to make contributions to a multiemployer pension fund does not constitute *per se* irreparable harm.  *Id.*  A moving party must show that the injury is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.  *Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F. Supp.2d 49, 54 (D.D.C. 2004).  It must be actual and certain, not a mere theoretical possibility.  *Id.* (citing *Wisconsin Gas Co. v. FERC*, 785 F.2d 669, 674 (D.C. Cir. 1985)).  Plaintiff's speculation of possible future injury does not establish the requisite presently existing irreparable harm.  *Pattern Makers' Pension Trust Fund*, 1992 U.S. Dist. LEXIS 10193, at *4.

Plaintiff argues that the Central Pension Fund will suffer irreparable harm because its financial security will be endangered without the contributions from HMIS.  Plaintiff's Memorandum of Points and Authorities In Support of Motion for Preliminary Injunction ("Pl. Mem.") at 12-14.  Plaintiff also asserts that the Central Pension Fund will be irreparably harmed because it will be compelled to forego investment money and opportunities which are part of the

---

[3] HMIS objects to the Central Pension Fund's calculation of the alleged delinquent contributions.  It does not agree with the contribution rate or the credited hours.  Moreover, the auditor may have included employees who are not performing covered work.  Therefore, even if the Court finds that HMIS owes additional contributions, the Company does not believe that the Central Pension Fund can prove that the Court should award $1,549,855.60, which is the total amount allegedly owed.

Fund's long-term planning and investment assumptions. Pl. Mem. at 14. Finally, Plaintiff

claims irreparable harm because other employers will not be deterred from non-compliance with

their obligation to make contributions, and the Central Pension Fund will be forced to file

lawsuits to collect contributions.[4] *Id.* at 14-15.

Plaintiff has failed to demonstrate that the Central Pension Fund's financial condition is

so dire that without HMIS's contributions it will not be able to meet its pension obligations.

Plaintiff's concern about the financial stability of the Central Pension Fund is specious. There is

no evidence that without an injunction the Central Pension Fund will be prevented from paying

vested pension obligations[5]. In fact, the Central Pension Fund does not require HMIS's

contributions for any immediate purpose.

At a time when the percentage of multiemployer plans which are underfunded is rising,[6]

the Central Pension Fund's vested benefits are fully funded. *See* Exhibit 2 (Annual Accounting

Information for Participating Employers (Feb. 2007)). As the GAO Report shows, it is the rare

fund which does not have any employer withdrawal liability.[7] The Central Pension Fund

currently enjoys income of $755,665,442 in excess of its current obligation to pay out pension

benefits. *See* Exhibit 3 (Summary Annual Report for the Central Pension Fund (Oct. 2006)).

---

[4] Plaintiff also points to harm to current and former employees of HMIS. Id. at 15-16. Since the Central Pension Fund is fully funded, it is unclear which employees would have serious concerns about receiving benefits, other than those who never will vest in benefits because they are not members of IUOE.

[5] Vested pension obligations are benefits that are no longer subject to risk of forfeiture by the employee. U.S. General Accounting Office, Private Pensions: Multiemployer Pensions Face Key Challenges to their Long-Term Prospects 5 (March 18, 2004)

[6] The U.S. General Accounting Office reported that the percentage of underfunded multiemployer pension plans rose from 17% in 2001 to 33% in 2002. *Supra* n.5 at 8.

[7] In 1980, Congress amended the Employee Retirement Income Security Act ("ERISA") in the Multiemployer Pension Plan Amendments Act ("MPPAA") as a means to dissuade employers from withdrawing from a fund to avoid liability for unfunded vested benefits of participants and beneficiaries. The purpose of MPPAA was to allocate the unfunded vested benefits equitably to withdrawing employers by calculating their fair share of the liability. Employers who withdraw are required to pay a proportionate share of the unfunded vested benefits and future liabilities. That allocation is "withdrawal liability." MITZNER, IRA, ERISA LITIGATION: A BASIC GUIDE 112 (Int'l Found. of Employee Benefit Plans 1993).

Even if HMIS never paid the $1,549,855.60 allegedly owed, the pension benefits to which an employee currently is entitled would not be jeopardized. Plaintiff simply wants to avoid the possibility of some remote and highly unlikely future injury. *Accord Pattern Makers' Pension Trust Fund*, 1992 U.S. Dist. LEXIS 10193, *4 (threat to actuarial soundness and integrity of the fund and potential loss of investment opportunities did not warrant injunctive relief).

The essence of Plaintiff's claim for delinquent contributions is that the Central Pension Fund will suffer a financial loss if the Court does not grant its motion. It claims that it will lose investment income, incur attorneys' fees and have to go without these contributions pending the outcome of this litigation. A financial loss can be remedied with money damages. It is well-settled that where the moving party may be compensated by an award of money damages, irreparable harm rarely exists. *DeBeers Consol. Mines Ltd, et al. v. United States*, 325 U.S. 212, 219-220 (1945); *Gray v. District of Columbia*, Civil Action No. 06-0144 (RMU), 2007 U.S. Dist. LEXIS 15263, **13-14 (D.D.C. Mar. 6, 2007).

In contrast to the employer in *Hotel Employees and Restaurant Employees International Union Welfare/Pension Funds v. Caucus Club, Inc.*, 754 F. Supp. 539, 546 (E.D. Mich. 1991), there is no evidence that a preliminary injunction is necessary because HMIS is in a precarious financial condition which makes Plaintiff's legal remedy inadequate. In fact, the evidence is to the contrary. The evidence shows that due to HMIS's financial condition, if and when liability is determined, there is every reason to believe that Plaintiff will be paid. HMIS has no intention to cease operations in the near future. There is no intent to liquidate the Company. HMIS is not on the verge of bankruptcy. The present value of HMIS's assets is approximately $2.1 million, which exceeds the amount of $1,549,855.60, which Plaintiff is claiming is unpaid. Moreover, unlike the employer in *Connors, et al. v. Shannopin Mining Co.*, 675 F. Supp. 986 (W.D. Penn.

1987), HMIS is continuing to make monthly contributions to the Central Pension Fund.

As Plaintiff points out, the failure of an employer to make timely contributions to a multiemployer pension plan can constitute irreparable injury under certain circumstances. In those cases, however, the moving party has alleged a critical need for the contributions. For example, the multiemployer plan was seeking to avoid the threatened immediate termination of benefits such as medical coverage for workers and their families, or the nonpayment of death benefits. *Van Drivers Local No. 392 Funds v. Neal Moving & Storage*, 551 F. Supp. 429, 432 (N.D. Ohio 1982)*; Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979); *United Steelworkers of America v. Ft. Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979). There is no allegation in this case that pension benefits will not be paid. In fact, Plaintiff contends that the irreparable harm will arise from paying pension benefits. Pl. Mem. at 12-13.

The evidence shows that the Central Pension Fund's income and investments are more than sufficient to pay out vested benefits. There is no real threat of emotional harm to workers or their beneficiaries because the Central Pension Fund will pay out their pension benefits. Further, unlike in *McCrory v. G.C. Monaco Electric Inc.*, Civil Action No. 88-1387 (CSH), 1989 U.S. Dist. LEXIS 7573, *4 (S.D.N.Y. July 5, 1989), where the employer had ignored repeated demands for payment of contributions for 15 months and had not submitted its monthly reports, there is no dispute that HMIS has been complying with its obligation to submit contributions and monthly reports. This dispute arises because the parties disagree regarding the hours reported and the contribution rate, and the inclusion of certain employees.

### B. If the Court Grants the Preliminary Injunction, HMIS Will Be Harmed To a Greater Extent Than the Central Pension Fund Will Suffer Without Injunctive Relief.

Should the Court grant Plaintiff's request that HMIS be ordered to pay all of the allegedly delinquent contributions before there is a finding of liability, the Company will suffer a greater

harm than Plaintiff will suffer from the denial of the injunction.  Unlike the employer in *Central States, Southeast and Southwest Areas Pension and Health & Welfare Funds, et al. v. McNamara Motor Express, Inc.*, 503 F. Supp. 96, 97 (W.D. Mich. 1980), who admitted that it had failed to make <u>any</u> contributions because of its declining financial condition, HMIS has not sought to avoid its obligation to make contributions to the Central Pension Fund.  The issue in this case is whether HMIS has paid a sufficient amount.  If, in fact, any additional contributions are due to the Central Pension Fund, that liability arises because the parties disagree regarding the contribution rate, creditable hours and the covered employees, not because HMIS unilaterally has ceased paying into the Fund.  Moreover, the employer in *McNamara Motor Express* was only required to make current contributions to the fund.  *Id.* at *3.  HMIS currently is honoring its obligation and contributing to the Central Pension Fund.

HMIS can generate the monthly cash flow that it needs to continue its current operations.  Its monthly sales income is about $700,000, and its monthly expenses, including contributions to the Central Pension Fund, are about $616,000.  If forced to pay to the Central Pension Fund the entire relief Plaintiff is seeking, which is in excess of one million dollars, HMIS will essentially be forced to shut down and liquidate to satisfy that obligation.  Paying that kind of money will inhibit HMIS's ability to operate, and may result in its demise before liability is even established.  The destruction of a business is more than a mere financial hardship.  *Connors*, 675 F. Supp. at 989.  The destruction of HMIS as an ongoing concern is irreparable harm to the Defendant.  *Central Transport, Inc., et al. v. Central States, Southeast and Southwest Areas Pension Fund, et al.*, 639 F. Supp. 788, 792 (E.D. Tenn. 1986).[8]

---

[8] Plaintiff's circular reasoning, *see* Pl. Mem. at 17 n.5, is not sufficient to avoid the fact that he currently has an adequate remedy at law as discussed above, *supra* at 7.  It is Plaintiff's own conduct that will deprive it of an adequate legal remedy.

The cases upon which Plaintiff relies to show that HMIS cannot assert its financial jeopardy as irreparable harm are not on all fours with this case. In *Pacific Ascorp* and *Neal Moving & Storage*, in weighing the competing interests, the courts found that it was more important to ensure that the plan participants and beneficiaries did not lose their health benefits. *Jones & Artis Constr. Co.* and *Burtman Iron Works, Inc.* did not involve preliminary injunctions, and the employers were ordered to make future contributions only after liability was determined. In *Caucus Club*, the employer simply was ordered not to sell or transfer any assets.

C.    **Plaintiff Has Failed to Show that the Public Interest is Best Served by the Issuance of an Injunction.**

While courts have found a compelling public interest in assuring the adequate funding of employee benefits plans and the avoidable termination of benefits, the issuance of a preliminary injunction in this case would not further that goal. As pointed out above, the Central Pension Fund is fully funded. Last year, its income exceeded the benefits paid to participants and beneficiaries by $755,665,442. HMIS could withdraw from the Central Pension Fund tomorrow and there would be no employer withdrawal liability. Clearly, the Central Pension Fund does not believe that its ability to meet its pension obligations would be threatened pending the outcome of this litigation, since upon discovery of the alleged delinquent contributions, it failed to take any action to collect for 15 months.

In contrast, there is a strong public interest in HMIS existing as an ongoing concern. It is in the public interest to protect the viability of private businesses when the protection will not prejudice other parties, and the threat to the viability of the pension fund rests upon questionable grounds. *Id.* If HMIS is forced to liquidate, an economic hardship will befall its workers who will be unemployed. *See Connors*, 675 F. Supp. at 989 ("while there is a strong public interest in the continued integrity of employee pension funds, the public has an interest in the continued

employment of the [workers who are beneficiaries of the fund]").  Accordingly, it is in the public interest to preserve the *status quo* pending the outcome of this litigation, especially since, unlike in *Caucus Club*, there is no risk of the lapse of benefits.

## III.    CONCLUSION

Plaintiff has failed to meet the requisite requirements for a preliminary injunction. Plaintiff has not demonstrated the requisite irreparable harm.  Because there is no "irreparable harm", preliminary injunctive relief may not be issued.  Moreover, the harm to HMIS if the injunction is issued and the public interest in HMIS's continued viability weigh in favor of denying Plaintiff's motion.

Wherefore, Defendant High Mountain Inspection Services, Inc. requests that the Court deny Plaintiff's motion for a preliminary injunction.


Dated: March 23, 2007                    Respectfully submitted,



                                        By:_____/s/_____
                                            Alison N. Davis, D.C. Bar No. 429700
                                            Kevin M. Kraham, D.C. Bar No. 459077

                                            FORD & HARRISON LLP
                                            1300 19th Street, N.W., Suite 700
                                            Washington, DC  20036
                                            Tel  (202) 719-2000
                                            Fax  (202) 719-2077
                                            adavis@fordharrison.com
                                            kkraham@fordharrison.com

                                            Attorneys for Defendant High Mountain Inspection
                                            Services, Inc.

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL FANNING,

        Plaintiff,

    v.

HIGH MOUNTAIN INSPECTION SERVICES,
INC.,

        Defendant.

Civil Action No. 06cv02177 (RJL)

## DECLARATION OF SUZANNE FRASER IN SUPPORT OF DEFENDANT HIGH MOUNTAIN INSPECTION SERVICES, INC.'S OPPOSITION TO PLAINTIFF MICHAEL FANNING'S MOTION FOR PRELIMINARY INJUNCTION

I, Suzanne Fraser, make the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am over eighteen (18) years of age, have personal knowledge of the facts set forth herein, am competent to so testify, and state that said facts are true.

2.     I am President of High Mountain Inspection Services, Inc. ("High Mountain" or "the Company").

3.     High Mountain is headquartered in Casper, Wyoming. Ownership of HMIS passed to the Bill Fraser Trust about one (1) year ago after my father, Bill Fraser, passed away.

4.     High Mountain is a solvent company, and currently there is no threat of bankruptcy. As of December 31, 2006, the Company's gross profit was $5,629,466.60. HMIS is not delinquent in paying its creditors. HMIS has $2,141,266.33 in assets. The assets of the Company are not being liquidated.

5.    HMIS's monthly sales income is about $700,000, and its monthly expenses, including contributions to the Central Pension Fund of the International Union of Operating Engineers and Participating Employers ("the Central Pension Fund"), are about $616,000.

6.    For almost 20 years, High Mountain has provided non-destructive testing services to operators of pipelines and refineries.  Non-destructive testing involves the evaluation of a pipeline for damage without damaging the pipeline.

7.    High Mountain has both unionized and non-unionized employees.  Employees who are engaged in pipeline nondestructive testing are covered by the collective bargaining agreement between the International Union of Operating Engineers ("IUOE"), Local 2B, It's [sic] Successors and/or Assigns and Certain Pipeline Non-destructive Testing Companies ("the Agreement").  The term of the Agreement at issue in this case was October 1, 2002  through September 30, 2006.    Pursuant to the Agreement, High Mountain was obligated to make contributions to the Central Pension Fund.

8.    On November 15, 2006, the parties entered into a new Agreement, effective October 1, 2006.  High Mountain has been making contributions to the Central Pension Fund in accordance with that Agreement.

9.    There are 15 employees who are covered by the Agreement.

10.    HMIS has 34 non-union employees.  The non-unionized employees primarily perform "call out" work, which generally entails working at a refinery, x-ray jobs, or jobs at a compressor station.  HMIS does not classify this work as work on the pipeline.

11.     I learned from my deceased father that Vergil Belfi, the Business Manager for

IUOE Local 2B assigned to High Mountain, had told him that the Company was obligated to

make contributions for employees working on the pipeline only.  Based upon this understanding,

High Mountain at all times prior to the audit report made contributions for employees working

on the pipeline.  Those employees for whom High Mountain was making contributions were

identified on the monthly Report of Contributions.  If there was error in the Report, the Fund

would contact High Mountain.  During the last round of negotiations, the parties agreed to a new

monthly contributions provision, and we currently are making monthly contributions in

accordance with that provision.

12.     On September 19, 2005, the Central Pension Fund commenced an audit of High

Mountain's payroll records for the period January 2002 through August 2005 by reviewing our

records on-site.  Any questions from the auditor were directed to me.  No further

communications were received regarding the audit until the results were sent to us on or about

November 20, 2006.  This was how I learned that the Central Pension Fund had determined that

we had underpaid our contributions in the amount of $1,549,855.60.  On or about December 19,

2006, High Mountain received a letter from counsel for the Fund advising us that the Central

Pension Fund would file suit for unpaid contributions if arrangements were not made for

payment by December 29, 2006.

13.     Some of the employees for whom the Central Pension Fund alleges that High

Mountain failed to make contributions are individuals who are not members of IUOE and will

never receive pension benefits from the Fund.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

23rd day of March, 2007, in Casper, Wyoming.


_____/s/_____
SUZANNE FRASER

# Exhibit 2



CENTRAL PENSION FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS AND PARTICIPATING EMPLOYERS
4115 CHESAPEAKE STREET, NW, WASHINGTON D.C. 20016-4665
202-362-1000  |  FAX 202-364-2913  |  WWW.CPFIUOE.ORG

# ANNUAL ACCOUNTING INFORMATION
# FOR PARTICIPATING EMPLOYERS

### February 2007

This Notice is intended to provide all information necessary for the annual tax filings of participating employers.

**Name of Plan:**  Central Pension Fund of the International Union of Operating Engineers and Participating Employers
**Administrators of the Plan:**  Board of Trustees of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers
4115 Chesapeake Street, NW, Washington, DC  20016-4665
**Employer Identification Number for the Plan:**  36-6052390
**Fiduciary Number:**  52-6118104
**Standard Industry Code:**  9519

Annual Return - Form 5500

The Central Pension Fund will file an Annual Return/Report of Employee Benefit Plan, Form 5500, with the U.S. Department of Labor for the Plan Year ending January 31, 2007. Therefore, participating employers should not file a Form 5500 with respect to their participation in the Central Pension Fund.

Legal Status

The Central Pension Fund is a non-contributory, multiemployer, defined benefit plan. The Fund's most recent IRS determination letter, which confirms the plan's status as a qualified plan under Internal Revenue Code Section 401(a), is dated March 7, 2003. The Fund's income is exempt from taxation pursuant to Internal Revenue Code Section 501(a). The Fund continues to satisfy all mandated legal and actuarial requirements, and has filed all required government reports in a timely manner.

Statement of Financial Accounting Standard No. 35

For purposes of making necessary accounting disclosures in accordance with Statement of Financial Accounting Standard No. 35, this is to confirm that the expected employer contributions for the Plan Year ending January 31, 2007 will satisfy ERISA's minimum contribution requirements, but not exceed the maximum contribution limits. Furthermore, as of February 1, 2006, the date of the most recent actuarial valuation of the Fund, the Central Pension Fund's actuarial value of assets is greater than the Fund's vested liabilities and, therefore, no withdrawal liability will be assessed against any employer who withdraws from participation during the Plan Year ending January 31, 2007, for purposes of the Multiemployer Pension Plan Amendments Act of 1980.

# Exhibit 3



CENTRAL PENSION FUND   of The International Union of Operating Engineers and Participating Employers

| Volume 36 | Number 1 |  | October 2006 |

# Summary Annual Report
## for the
### CENTRAL PENSION FUND OF THE
### INTERNATIONAL UNION OF OPERATING ENGINEERS
### AND PARTICIPATING EMPLOYERS

This is a summary of the annual report for the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, plan number 001, and employer identification number 36-6052390 (Plan), for the plan year beginning February 1, 2005 and ending January 31, 2006 (Plan Year). The annual report has been filed with the Employee Benefits Security Administration, as required under the Employee Retirement Income Security Act of 1974 (ERISA).

**Basic Financial Statement**
Benefits under the Plan are provided by a Trust. Plan expenses were $504,669,944. These expenses included $20,238,287 in administrative expenses and $484,431,657 in benefits paid to participants and beneficiaries. A total of 177,590 persons were participants in or beneficiaries of the Plan at the end of the Plan Year, although not all of these persons had yet earned the right to receive benefits.

The value of Plan assets, after subtracting liabilities of the Plan, was $8,939,447,281 as of January 31, 2006, compared to $8,204,020,126 as of February 1, 2005. During the Plan Year the Plan experienced an increase in its net assets of $735,427,155. This increase includes unrealized appreciation or depreciation in the value of Plan assets; that is, the difference between the value of the Plan's assets at the end of the year and the value of the assets at the beginning of the year or the cost of assets acquired during the year. The Plan had total income of $1,240,097,099, including employer contributions of $465,671,197, loss of $4,888,920 from the sale of assets, and earnings from investments of $779,314,822.

**Minimum Funding Standards**
An actuary's statement shows that enough money was contributed to the Plan to keep it funded in accordance with the minimum funding standards of ERISA.

**Your Rights to Additional Information**
You have the right to receive a copy of the full annual report, or any part thereof, on request. The items listed below are included in that report:

1. an accountant's report;
2. financial information and information on payments to service providers;
3. assets held for investment;
4. fiduciary information;

5. transactions in excess of 5 percent of the Plan assets;
6. information regarding any common or collective trusts in which the Plan participates, and
7. actuarial information regarding the funding of the Plan.

To obtain a copy of the full annual report, or any part thereof, write or call Michael R. Fanning, Chief Executive Officer, at Central Pension Fund, 4115 Chesapeake Street, NW, Washington, DC 20016-4665, (202) 362-1000. The charge to cover copying costs will be $5.00 for the full annual report, or $.25 per page for any part thereof. You also have the right to receive from the plan administrator, on request and at no charge, a statement of the assets and liabilities of the Plan and accompanying notes, or a statement of income and expenses of the Plan and accompanying notes, or both. If you request a copy of the full annual report from the plan administrator, these two statements and accompanying notes will be included as part of that report. The charge to cover copying costs given above does not include a charge for the copying of these portions of the report because these portions are furnished without charge. You also have the legally protected right to examine the annual report at the main office of the Plan (address above), and at the U.S. Department of Labor in Washington, DC or to obtain a copy from the U.S. Department of Labor upon payment of copying costs. Requests to the Department should be addressed to: Public Disclosure Room, N-1513, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, NW, Washington, DC 20210.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL FANNING,

        Plaintiff,

    v.

HIGH MOUNTAIN INSPECTION SERVICES,
INC.,

        Defendant.

Civil Action No. 06cv02177 (RJL)

### [PROPOSED] ORDER

Upon consideration of Plaintiff's Motion for Preliminary Injunction, any opposition

thereto, and the entire record herein, it is this _____ day of _____,

2007, hereby:

**ORDERED** that Plaintiff's Motion is **DENIED**.

_____
U.S. District Judge Richard J. Leon

Copies to:

Alison N. Davis
Kevin M. Kraham
Ford & Harrison LLP
1300 19th Street, N.W., Suite 700
Washington, DC  20036

Charles W. Gilligan
R. Richard Hopp
O'Donoghue & O'Donoghue LLP
4748 Wisconsin Avenue, N.W.
Washington, DC  20016

DC:65261.1